Filed 5/1/18

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHARLES WESLEY BRADY,<br><br>    Defendant and Appellant. | D071024<br><br><br><br>(Super. Ct. No. SCD265144) |

APPEAL from a judgment of the Superior Court of San Diego County,

Laura W. Halgren, Judge.  Affirmed.

Andrea S. Bitar, under appointment by the Court of Appeal, for Defendant and

Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Seth M.

Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

\* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part 2.

Following a street side jewelry transaction gone awry, defendant Charles Wesley Brady stabbed his former customer. Based on that incident, a jury convicted him of assault with a deadly weapon (a knife). (Pen. Code, §§ 245, subd. (a)(1), 1192.7, subd. (c)(23).)[1] It also found that, in doing so, he inflicted great bodily injury. (§§ 1192.7, subd. (c)(8), 12022.7, subd. (a).)

By convicting Brady, the jury necessarily rejected his primary defensive theory— that he was acting in self-defense. On appeal, he asserts that no reasonable jury could reach that conclusion. While his argument ultimately challenges the sufficiency of the evidence underlying his conviction, before arriving there he raises an interesting question as to the relevant legal standard.

To justify an act based on self-defense, a defendant must have subjectively held an objectively reasonable belief that bodily injury was imminent. The objective component considers what would have appeared necessary to a reasonable person in the defendant's situation and with his or her knowledge. Because the objective standard looks from "the defendant's perspective," Brady contends it should take into account his mental condition and past traumatic experiences. Essentially, Brady argues that the relevant question is what a reasonable person with bipolar disorder, posttraumatic stress disorder, and his personal history would have done in the situation—i.e., what would a reasonable Brady do? That, we think, is not the standard.

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

While two recent cases admitted *seemingly* similar evidence as relevant to the reasonableness requirement, a closer look reveals that Brady's proffered attributes are of a different nature. Those cases, which we discuss in depth below, deem relevant evidence that demonstrates a defendant's ability to more accurately perceive actual threats. In contrast, the attributes Brady relies upon ostensibly render him more likely to *misperceive* threats. Regrettably for Brady, the reasonable person standard does not subsume a defendant's unique personal susceptibility to inaccurate perception.

Applying the correct legal standard—as the jury did—we conclude sufficient evidence supports its rejection of Brady's self-defense theory for want of objective reasonableness. Moreover, there was sufficient evidence for the jury to repudiate his self-defense claim on other grounds. The jury may have concluded that Brady was not acting out of actual fear for his life since, contrary to his testimony at trial, he told police officers shortly after the event that he was acting to protect his property and made no mention of protecting his person. Alternatively, the jury may have determined that any threat to Brady was not imminent or that the force he used was unreasonable, given that video surveillance showed Brady acting more aggressively than his victim.

In the unpublished portion of this opinion, we consider and reject Brady's two other claims on appeal, both of which relate to the great bodily injury enhancement imposed under section 12022.7, subdivision (a).

Accordingly, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Brady was homeless in downtown San Diego. To make money, he sold hats, costume jewelry, and the like to passersby on the street. Lincoln M., another homeless individual, was one such passerby.[2]

Lincoln was initially drawn to the silver jewelry Brady peddled. The two struck up conversation and became acquaintances, though not friends. Brady learned that Lincoln sold drugs, shoplifted, and—like Brady—had previously spent time in prison. Brady never saw Lincoln carry a gun but knew, or at least strongly suspected, that he carried a knife given the dangers of living on the streets. The two had never argued nor fought previously.

Their relationship soured after a particular transaction. One night in January, Lincoln purchased two pieces of silver jewelry (a necklace and wristband) from Brady for $40. The next morning Brady ran into Lincoln and a friend near a San Diego trolley stop.

Lincoln told Brady that he'd returned the purchased necklace to Brady's "partner" and wanted his $40 returned. He twice threatened, "Diemu, you need to give me my $40 back before I stick you with my kazoo." Brady understood "Diemu" to mean "that [he] was a Blood," i.e., a gang member, and "kazoo" to mean a knife. With one hand, Brady

---

[2] California Rules of Court, rule 8.90(b) states that we "should consider referring to" certain individuals "by first name and last initial or, if the first name is unusual or other circumstances would defeat the anonymity, by initials only" in order to protect those individuals' privacy. Accordingly, we refer to the victim in this case by his first name and last initial, and thereafter by first name only.

touched or lightly pushed Lincoln on the chest several times while Lincoln fidgeted with his own wallet. As Lincoln turned his gaze away from Brady and looked off into the distance, Brady suddenly grabbed the collar of his sweatshirt with one hand and thrust a knife into his lower abdomen with the other.

After stabbing Lincoln once, Brady gathered his things and walked away. A private security guard trailed him until the police arrived. While detained, Brady told the police, "I'd fucking stab somebody if they fucked with my property" and "I am going to jail for protecting my mother-fucking property." The police found no weapon, knife or otherwise, on Brady. A search of Lincoln's belongings likewise yielded no weapon.

The stab wound to Lincoln, resulting in a gash approximately four centimeters in length, pierced his abdominal cavity. Although there was no active internal bleeding, he was rushed to surgery so that doctors could repair the hole in his abdominal wall. The surgery entailed a formal laparotomy, requiring an incision from under Lincoln's breast bone down to his pelvis; the procedure typically takes one to two hours.

Brady was subsequently charged by a single-count information with assault with a deadly weapon (§ 245, subd. (a)(1)). It was further alleged that, in committing the offense, Brady personally used a dangerous and deadly weapon (a knife) within the meaning of section 1192.7, subdivision (c)(23) and personally inflicted great bodily injury on Lincoln within the meaning of both sections 12022.7, subdivision (a) and 1192.7, subdivision (c)(8). Allegations that two prior convictions qualified as strikes were also included (§§ 667, subds. (b)–(i), 1170.12, 668), in addition to a prison prior

5

allegation (§§ 667.5, 668) and two serious felony prior allegations (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)). The case was tried to a jury.

At trial, the prosecution introduced video footage of the incident captured by San Diego Metropolitan Transit System surveillance. The private security guard who witnessed the incident, albeit from about 100 feet away, testified that Brady appeared angrier and more aggressive than Lincoln. Three police officers who responded to the stabbing testified as well. One relayed Brady's postdetainment statements regarding protecting his property; the officer did not recall Brady expressing that he was acting in self-defense or feared Lincoln. The officer also described Brady's behavior while detained as "aggressive" and "just not very compliant." Finally, the People called the surgeon who treated Lincoln's injury; she explained the severity of the wound and the ensuing surgical procedure. Lincoln did not testify.

In his defense, Brady presented character evidence—both to vilify Lincoln and to bolster Brady's repute. As to Lincoln, a San Diego Police Department detective testified about a prior occasion when he stole someone's wallet at a fast food restaurant. Lincoln's former girlfriend testified that he sold drugs, frequently got into (and lost) fights, was a pimp, convinced her to become a prostitute, and abused her. As to Brady, two other witnesses attested to his kind and honest character.

Brady also took the stand and explained his personal history. He grew up in a small town in Georgia where, at around four or five years old, he was sexually abused at knifepoint by a neighbor. His mother too started physically abusing him at a young age. In one incident, she struck him with the back of a butcher's knife. After about nine years

6

of abuse, fifteen-year-old Brady left home and set out on his own.  Having previously been assigned to special education classes, Brady attended no further school.

Things did not get easier for Brady.  In his late teens, he was jumped on two occasions by groups of five to six people, armed in the first incident with chains and a tire iron and the second with bats.  The beatings led to a seizure disorder.

In his early thirties, Brady came to the West Coast and started using crack cocaine.  His drug use led to criminal activity.  He was convicted twice for robbery in the 1980's, once for petty theft with a prior in 1994, and once for selling crack to an undercover officer in 1998.  As a result, he spent most of the time from 1985 to 2010 in prison.  There, he was stabbed on three occasions.  The third stabbing incident, involving a broomstick to his eye, left him partially blind.

In 2010, Brady's situation improved somewhat; he attended a residential treatment program that helped him address his addiction to crack cocaine.  But as of January 2016, when this incident occurred, Brady remained homeless in San Diego.  As to that altercation, Brady testified he was scared of Lincoln and acted out of that fear.

The defense presented expert testimony from a neuropsychologist who examined Brady.  She testified that Brady had past diagnoses of bipolar disorder, schizophrenia, psychosis, and a substance abuse disorder.  As to his current state, she did not conclude that he still suffered from schizophrenia but also did not rule out the possibility.  She diagnosed Brady with early onset bipolar disorder and posttraumatic stress disorder (PTSD), and explained the possible implications.  She elaborated that individuals with PTSD are usually hypervigilant, i.e., "constantly on guard to [their] surroundings," and

7

often "misperceive situations" when in "that heightened state of arousal PTSD produces." "They would misperceive slights that we would probably let roll off our back as grand insults. They would be ready to fight with very little provocation."

Thereafter, the court instructed the jury on, among other things, self-defense (CALCRIM No. 3470) and defense of real or personal property (CALCRIM No. 3476).

The jury found Brady guilty of the assault. It also found true the allegation that he used a dangerous and deadly weapon (§ 1192.7, subd. (c)(23)) and both allegations involving personal infliction of great bodily injury (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)). Brady admitted he had two prior strikes (§§ 667, subds. (b)–(i), 1170.12, 668) and that both were for serious felonies (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)). He also admitted a prison prior. (§§ 667.5, subd. (b), 668.)

At sentencing, the court struck the prior strikes and prison prior pursuant to section 1385. Brady was sentenced to 15 years in prison (2 years for the assault conviction, 3 years for the section 12022.7 enhancement, and two consecutive 5-year terms for the section 667, subdivision (a)(1) serious felony priors).

DISCUSSION

1. *Self-Defense*

On appeal, Brady argues that there was insufficient evidence for the jury to reject his theory of self-defense.  " 'In assessing the sufficiency of the evidence, we review the record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' "  (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 226.)  We resolve all evidentiary conflicts and questions of credibility "in favor of the verdict, drawing every reasonable inference the jury could draw from the evidence."  (*Id.* at pp. 226–227.)

" 'To justify an act of self-defense for [an assault charge under section 245], the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him.' "  (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064 (*Minifie*).)  In other words, the defendant's belief must both subjectively exist and be objectively reasonable.  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 (*Humphrey*).)  Additionally, "[t]he threat of bodily injury must be imminent" and the force used in response " 'reasonable under the circumstances.' "  (*Minifie*, at pp. 1064–1065.)

To assess whether a belief was objectively reasonable, "a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge.' "  (*Humphrey*, *supra*, 13 Cal.4th at pp. 1082–1083.)  It must assume " 'the point of view of a reasonable person in the position of the defendant,' " taking into

9

account " 'all the elements in the case which might be expected to operate on his mind.' " (*Id.* at p. 1083.)

Contrary to Brady's assertions, this does not mean that the objective inquiry adopts the standpoint of a reasonable person "with [his] background of trauma, abuse, mental illness, and physical limitations." "The issue is not whether defendant, or a person like him, had reasonable grounds for believing he was in danger." (*People v. Jefferson* (2004) 119 Cal.App.4th 508, 519 (*Jefferson*).) It is instead "whether a person of ordinary and normal mental and physical capacity would have believed he was in imminent danger of bodily injury under the known circumstances." (*Id.* at p. 520.)

The cases Brady relies upon—*Humphrey*, *supra*, 13 Cal.4th 1073 and *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732 (*Sotelo-Urena*)—do not provide otherwise. In *Humphrey*, the Supreme Court concluded that expert testimony regarding intimate partner battering[3] was relevant to a self-defense claim—not just with respect to the defendant's subjective mindset but also as to the reasonableness of her action and as to her credibility. Regarding the objective reasonableness requirement, the court emphasized that "the jury . . . must view the situation from the *defendant's perspective*." (*Humphrey*, at p. 1086.) Expert testimony could show that "[a]s violence increases over time, and threats gain credibility, a battered person might become sensitized and thus able reasonably to discern when danger is real and when it is not"; thus, it could shed light on

---

3 The *Humphrey* court referred to "battered woman's syndrome"; it has since been renamed "intimate partner battering." (Evid. Code, § 1107, subd. (f); *Sotelo-Urena*, *supra*, 4 Cal.App.5th at p. 746, fn. 4.)

the defendant's ability " 'to predict *accurately* the likely extent of violence in any attack on her.' " (*Ibid.*, italics added.) As Justice Brown noted in her concurrence, "[a]bsent the expert's explanation, the average juror might be unduly skeptical that a look, footstep, or tone of voice could in fact signal impending grave harm or that a reasonable person would be able *accurately* to assess the need to take self-defensive action on that basis." (*Id.* at p. 1102 (conc. opn. of Brown, J.), italics added.)

Yet the court made clear that it was *not* holding that all of the expert testimony on intimate partner battering was relevant to the objective prong of a self-defense claim. (*Humphrey*, *supra*, 13 Cal.4th at p. 1088.) "Evidence merely showing that a person's use of deadly force is scientifically explainable or empirically common does not, in itself, show it was objectively reasonable." (*Ibid.*) Thus, *Humphrey* advised that "it might be appropriate for the court, on request, to clarify that, in assessing reasonableness, the question is whether a reasonable person in the defendant's circumstances would have perceived a threat of imminent injury or death, and *not* whether killing the abuser was reasonable in the sense of being an understandable response to ongoing abuse; and that, therefore, in making that assessment, the jury may *not* consider evidence merely showing that an abused person's use of force against the abuser is understandable." (*Ibid.*, italics added.)

Relying on *Humphrey*, the Second Division of the First Appellate District concluded in *Sotelo-Urena*, *supra*, 4 Cal.App.5th 732 that expert testimony concerning chronic homelessness was relevant to the objective prong of a self-defense claim. The court stated, "For the same reasons [as in *Humphrey*], expert testimony explaining why a

11

chronically homeless individual would experience a heightened fear of aggression would assist a jury in weighing the reasonableness of defendant's belief of imminent harm, as was central to defendant's self-defense claim. Given the earlier assault on defendant and heightened sensitivity to violence experienced by the chronic homeless, the jury may have concluded that defendant was ' "justified in acting more quickly and taking harsher measures for [his] own protection in event of assault than would a person" ' who was not chronically homeless. [Citation.] Paraphrasing the *Humphrey* court, ' "Evidence of [chronic homelessness] not only explains how a [chronically homeless individual] might think, react, or behave, it places it in an understandable light." ' " (*Sotelo-Urena*, at p. 751.)

We think caution is warranted in interpreting *Sotelo-Urena*'s reference to *Humphrey*.[4] The *Humphrey* court was careful to explain that "reasonable" and "understandable" are distinct. (13 Cal.4th at p. 1088.) *Sotelo-Urena*'s paraphrase of *Humphrey*—referencing "an understandable light"—is taken not from *Humphrey*'s discussion of how the expert testimony related to reasonableness, but of how it related to the defendant's credibility. In any event, we do not think that the *Sotelo-Urena* court intended to equate "understandable" with "reasonable." Indeed, it explicitly disavowed the notion that it was "creating a reasonable homeless person standard." (4 Cal.App.5th

---

4       *Humphrey*'s holding was explicitly tethered to Evidence Code section 1107. (*Humphrey*, *supra*, 13 Cal.4th at p. 1087.) Accordingly, the court "express[ed] no opinion on the admissibility of expert testimony regarding other possible syndromes in support of a claim of self-defense." (*Ibid.*) *Sotelo-Urena* could have conceivably distinguished *Humphrey* on this ground alone.

12

at pp. 751–752; see also *Humphrey*, *supra,* 13 Cal.4th at p. 1087 ["Our decision would not, in another context, compel adoption of a ' "reasonable gang member" standard' "].)

*Sotelo-Urena* is better read as concluding that expert testimony regarding chronic homelessness could bear on the issue of reasonableness by showing that, due to the greater incidence of violence toward homeless persons, "a [homeless individual] might become sensitized and thus reasonably able to discern when danger is real and when it is not." (*Humphrey*, *supra*, 13 Cal.4th at p. 1086.) The relevance to reasonableness is *not* that the expert testimony helps the jury to better *understand* the potential for a "heightened fear of aggression" (*Sotelo-Urena*, *supra*, 4 Cal.App.5th at p. 751) because it is "scientifically explainable or empirically common" (*Humphrey*, at p. 1086). Rather it is that the "heightened sensitivity to violence experienced by the chronic homeless" (*Sotelo-Urena*, at p. 751) sheds light on their potential ability " 'to predict accurately the likely extent of violence in any attack' " (*Humphrey*, at p. 1086).

Simply put, we view *Humphrey* and *Sotelo-Urena* as providing that the reasonable person standard takes into account a defendant's knowledge that may increase his or her

ability to *accurately* predict impending violence.[5] (See *Humphrey*, *supra*, 13 Cal.4th at p. 1083 [" 'In determining whether a reasonable person *in defendant's position* would have been aware of the risks, the jury should be given relevant facts as to what defendant knew, including his actual awareness of those risks' "], quoting *People v. Ochoa* (1993) 6 Cal.4th 1199, 1205.) That is not the kind of information Brady contends falls within the reasonable person standard. He relies on personal attributes that purportedly increased his propensity to *misperceive* threats of violence.

To be sure, Brady's life has been difficult. He has endured many events that could render understandable his quick response (and perhaps overreaction) to perceived threats. But his personal history of "trauma, abuse, mental illness, and physical limitations" is not folded into the objective prong of a self-defense claim. "[B]ecause only he fits this particular description, [Brady] would be setting his own standard of conduct, contrary to the law. Such a rule would eliminate the objective standard in favor of a subjective one." (*People v. Steele* (2002) 27 Cal.4th 1230, 1254–1255 (*Steele*) [rejecting defendant's argument that, in assessing the objective component of heat of passion manslaughter, "the

---

5       We note, however, that even our narrowed reading of *Sotelo-Urena* could be seen as an expansion of *Humphrey*—or, perhaps, inconsistent with it. *Humphrey* largely considered the defendant's knowledge that was specific to the victim. For example, the expert might " 'testify that, because a battered woman is attuned to her abuser's pattern of attacks, she learns to recognize subtle gestures or threats that distinguish the severity of attacks and that lead her to believe a particular attack will seriously threaten her survival.' " (*Humphrey*, *supra*, 13 Cal.4th at p. 1096 (conc. opn. of Brown, J.).) Such was not the case in *Sotelo-Urena*. We can only assume the court implicitly concluded "there was also evidence from which the jury could infer that the defendant reasonably associated the victim with" his knowledge of how to predict harm more accurately. (*Minifie*, *supra*, 13 Cal.4th at p. 1069.)

14

jury must consider all the circumstances confronting him, including his particular mental condition"]; see also *Jefferson*, *supra*, 119 Cal.App.4th at pp. 519–520 [rejecting defendant's argument that "*Humphrey* required the admission [] of his mental condition as part of establishing the reasonable person standard" for self-defense]; cf. *People v. Romero* (1999) 69 Cal.App.4th 846, 848, 853–854 [rejecting defendant's argument that "expert testimony on the sociology of poverty, and the role of honor, paternalism, and street fighters in the Hispanic culture" was relevant to the objective component of a self-defense claim].)

The issue remains "whether a 'reasonable person' in [Brady's] situation, seeing and knowing the same facts, would be justified in believing he was in imminent danger of bodily harm." (*Jefferson*, *supra*, 119 Cal.App.4th at p. 519.)  As our Supreme Court stated in a similar context, " '[e]vidence of defendant's extraordinary character and environmental deficiencies [are] manifestly irrelevant to the inquiry.' "  (*Steele*, *supra*, 27 Cal.4th at p. 1253 [considering objective component of heat of passion manslaughter].)

Applying this standard, there was sufficient evidence for the jury to reject Brady's claim of self-defense based on a lack of objective reasonableness.[6]  The video footage showed that, during the incident, Lincoln did not advance towards Brady, otherwise act in

_____

[6]    Notably, this is the very standard the jury applied.  At the People's request, the court gave a pinpoint instruction in connection with CALCRIM No. 3470 (self-defense). The instruction, based on *Jefferson*, *supra*, 119 Cal.App.4th 508, provided: "In determining how a reasonable person would act, you cannot consider as a circumstance a mental state unique to the defendant which affected his ability to perceive the situation. You are to consider how a reasonable person in the defendant's position seeing and knowing the same facts would act."  Brady makes no claim of instructional error on appeal.

15

a physically threatening manner, or appear to reach for any "kazoo" (i.e., knife). To the contrary, the video showed that Lincoln was looking away from Brady when he was stabbed. The video also depicted Brady repeatedly pushing Lincoln before the stabbing; Lincoln showed no similar physical aggression. An eyewitness corroborated the fact that Brady acted more aggressively than Lincoln and appeared angrier. In addition, the jury learned that immediately following the incident Brady told police he was acting to protect his property and did not say he acted out of fear for his life.

Moreover, Brady's appeal assumes that the jury rejected his claim of self-defense for want of objective reasonableness. Yet the evidence discussed above could just as easily support the jury's rejection of Brady's claim of self-defense on other grounds. Given Brady's poststabbing statements to officers about protecting his property and the video footage of the incident, the jury could have rejected Brady's testimony that he was subjectively afraid of physical harm when he acted. Similarly, since the video did not depict Lincoln behaving in an overtly threatening manner, the jury could have concluded that any threat to Brady was not sufficiently imminent or that the amount of force he used in response was unreasonable.[7]

---

[7] Brady very briefly posits that the jury could not have rejected his defense of property theory either—i.e., that he was acting in defense of "his property (when [Lincoln] asserted he would take $40 from [Brady])." He does not further develop this argument on appeal. But, even if he did, we would reject it for the same reasons that we find his arguments regarding self-defense unpersuasive. Suffice it to say, a reasonable jury could well determine that stabbing someone over $40 entailed an unreasonable use of force. (See CALCRIM No. 3476 [a possessor or owner of real or personal property "may use reasonable force to protect that property from imminent harm"].)

16

In sum, viewing the evidence in the light most favorable to the verdict—as we must—the jury's rejection of Brady's claim of self-defense is sufficiently supported by the evidence.

2.      *Great Bodily Injury Enhancement*

Brady's two other claims on appeal both relate to the great bodily injury enhancement imposed.  (§ 12022.7, subd. (a).)

a.      *Sufficiency of the Evidence*

Brady argues there was insufficient evidence to support the jury's finding that he inflicted "great bodily injury" on Lincoln within the meaning of section 12022.7.  Under that section, " 'great bodily injury' means a significant or substantial injury."  (§ 12022.7, subd. (f).)  The injury must be "*beyond* that inherent in the offense."  (*People v. Escobar* (1992) 3 Cal.4th 740, 746 (*Escobar*).)  But the victim need not "suffer 'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function."  (*Id.* at p. 750.)  "Proof that a victim's bodily injury is 'great'—that is, significant or substantial within the meaning of section 12022.7—is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury."  (*People v. Cross* (2008) 45 Cal.4th 58, 66 (*Cross*).)

"It is well settled that the determination of great bodily injury is essentially a question of fact, not of law."  (*Escobar*, *supra*, 3 Cal.4th at p. 750; accord, *Cross*, *supra*, 45 Cal.4th at p. 64.)  " ' "If there is sufficient evidence to sustain the jury's finding of great bodily injury, we are bound to accept it, even though the circumstances might reasonably be reconciled with a contrary finding." ' "  (*Escobar*, at p. 750.)

17

Sufficient evidence supports the section 12022.7 finding here.  The stab was deep enough to pierce Lincoln's abdominal wall and require surgical intervention.  The treating surgeon testified that, because the abdominal cavity was violated, there was "significant concern for injury to the organs within the abdomen" that "could be potentially life-threatening."  During the operation, "multiple injuries to the intestines as well as to the blood supply to those intestines" had to be repaired.

This is not a case like *People v. Martinez* (1985) 171 Cal.App.3d 727 (*Martinez*), which Brady cites.  There, we concluded that insufficient evidence supported a section 12022.7 finding based on " 'a little stab' " through a heavy coat and multiple shirts.  (*Martinez*, at p. 735.)  Even the prosecutor had recognized the apparent triviality of the wound, describing it as " 'almost like a pinprick' " and seeking to strike the allegation at trial.  (*Id.* at pp. 735–736.)  Lincoln's injury was certainly of a far greater magnitude, more than sufficient to support the jury's section 12022.7 finding.

b. *Discretion to Strike Enhancement*

Alternatively, Brady argues the trial court should have stricken the enhancement. A true finding under section 12022.7, subdivision (a) carries with it "an additional and consecutive term of imprisonment in the state prison for three years." The court may strike the enhancement or the attendant punishment "in the furtherance of justice" under section 1385. (*In re Pacheco* (2007) 155 Cal.App.4th 1439, 1444; see also *People v. Fuentes* (2016) 1 Cal.5th 218, 225–226.) " ' "[T]he language of [section 1385], 'furtherance of justice,' requires consideration both of the constitutional rights of the defendant, and the interests of society represented by the People." ' " (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 530, italics omitted.)

We review the trial court's decision as to whether or not to strike an enhancement for an abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 374–375 (*Carmony*).) "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.) We are not authorized to simply substitute our judgment for that of the trial judge. (*Ibid.*)

The record reflects that the trial court carefully considered how to sentence Brady. The probation report recommended 25 years to life, plus an additional 14 years based on the relevant enhancements. Yet, mindful of Brady's older age, personal history, and mental conditions, the court imposed only the low term (2 years) for the section 245, subdivision (a)(1) conviction and struck his two prior strikes (§§ 667, subds. (b)–(i), 1170.12, 668), as well as his prison prior (§§ 667.5, subd. (b), 668). Brady was ultimately sentenced to 15 years in prison.

19

The judge thoughtfully weighed her decision not to strike the section 12022.7 enhancement, noting that it was the "biggest issue [she] had to debate in [her] mind." She reasoned, "In my view, it is appropriate to impose the three-year term and not to strike it because the victim was in fact stabbed and injured and needed medical treatment, multiple layers of sutures were rendered, and had he not received medical treatment, he could have had — who knows? Bleeding could have continued on and he may have died, we don't know. It's fortunate that medical intervention came in quickly, but I think that the injury was significant enough that it doesn't merit the striking of the punishment."

Brady now argues that the failure to strike the enhancement was an abuse of discretion in light of his "medical condition, history of trauma and abuse, relatively stable behavior for the five years prior to this most recent conviction, and age." While sympathetic to the hardships Brady has endured, we discern no abuse of discretion. The record shows that the trial court was cognizant of Brady's personal issues. It apparently concluded that those considerations did not—at least with respect to this particular enhancement—outweigh other pertinent considerations, including the seriousness of the injury he inflicted on Lincoln. Certainly, we cannot conclude that the court's decision was "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at p. 377.)

DISPOSITION

The judgment is affirmed.


DATO, J.

WE CONCUR:


BENKE, Acting P. J.


AARON, J.