Filed 11/3/22  P. v. Boyd CA3
Opinion following rehearing

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>ASHIRON BOYD,<br><br>    Defendant and Appellant. | C093382<br><br>(Super. Ct. No. STKCRFE20190001382)<br><br>OPINION ON REHEARING |

After the victim, Frank Baker, attacked defendant Ashiron Boyd with a pipe, defendant beat him badly, leaving Baker's skull severely fractured in multiple places. Baker died from the injuries. A jury found defendant guilty of voluntary manslaughter, as a lesser included offense of murder, and assault with a deadly weapon with a great bodily injury enhancement. The trial court sentenced defendant to an upper term of 11 years in prison. Defendant appeals the convictions, contending the trial court erred by: (1) excluding expert testimony on the effects of chronic stress on brain function and

1

development; and (2) refusing to instruct the jury on justifiable homicide in defense of home.  In our original opinion, we concluded any errors were harmless and affirmed the convictions.

During the pendency of this appeal, the Governor signed Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731, § 1.3; Senate Bill 567),[1] amending Penal Code section 1170.[2]  As relevant here, the amendments to section 1170 limit the trial court's discretion to impose the greater term (§ 1170, subd. (b)(1) & (2)) and mandate imposition of the lower term in certain circumstances, including where the offender is under 26 years old at the time of the offense or has experienced physical, psychological, or childhood trauma contributing to the commission of the offense (§ 1170, subd. (b)(6)). These amendments apply retroactively to nonfinal judgments.  (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039 (*Flores*).)  Accordingly, in our original opinion, we vacated the sentence and remanded for resentencing.

After our opinion issued, defendant filed a petition for rehearing claiming the original opinion:  (1) had not addressed his claims of federal constitutional error, and those claims required review under the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*); (2) did not consider the education and corroboration the expert's testimony would have provided; and (3) did not consider the benefit the instruction on defense of home would have provided to defendant.  We granted the petition for rehearing and vacated our August 23, 2022 decision.  Upon consideration of the petition for rehearing, we again conclude any errors were harmless and affirm the convictions, and again conclude defendant is entitled to the ameliorative benefits of recent legislative changes, so we vacate the sentence and remand for resentencing.

---

[1]  Senate Bill 567 was enacted after Assembly Bill No. 124 and incorporated Assembly Bill No. 124's amendments to section 1170.  (Stats. 2021, ch. 731, § 3(c).)

[2]  Undesignated statutory references are to the Penal Code.

# I. BACKGROUND

In January 2019, defendant and Baker were both living on the street. Defendant had been living on the street for approximately two years. During that period, he had been robbed multiple times and involved in numerous fights. Although defendant and Baker had not previously fought with each other, defendant had seen Baker hit people with a "billy club" twice in the past. In 2015, Baker was convicted of assault with a deadly weapon, a barbell, with a great bodily injury enhancement, and in 2010 he was convicted of a misdemeanor battery.

One night, defendant and other people were setting up to spend the night in front of the human services agency building in Stockton. Defendant had stayed at the human services agency building alcove for the previous few nights. Baker and defendant were each in the alcove of the building and had a conversation about making a trade for defendant's sleeping bag and exchanging defendant's sandwich for some of Baker's marijuana. At various points Baker left the alcove and returned to it.[3]

On Baker's final return to the alcove, defendant was standing in the alcove, slouched over with his hands on his upper thighs, when Baker assaulted defendant by swinging a pipe at him. The two men struggled for the pipe and fell to the ground. They continued to struggle, with both men holding the pipe, and Baker continued to try to hit defendant with the pipe. As the men stood facing each other, each holding the pipe, defendant testified Baker said he wanted to, and could, kill defendant. Defendant was

---

[3] The assault and homicide were captured on the security cameras of the human services agency building. The videos, People's Exhibits 88 and 89, were played for the jury, and testified to by witnesses. In addition, in ruling on defendant's motion for acquittal (§ 1118.1) and during the instruction conference, the trial court summarized the videos. Both rulings were based on the court's review of the videos. The copies of the videos provided to this court show some of the incident, but as it continues, and the actual homicide occurs, Baker and defendant are out of the frame. As the court's summaries of the videos were not objected to, and are consistent with the descriptions by the parties and testimony, we utilize these summaries in our description of the videos.

afraid and was trying to defend himself. Baker told defendant if he let go of the pipe, Baker would continue to hit him. There was another man nearby who Baker kept telling to help him, but that man refused to get involved. Defendant testified he was becoming more and more paranoid as the fight continued, because no one was trying to help him. He felt unsafe and that, if he did not get the "upper hand" in the fight, he might end up murdered.

Defendant hit Baker several times in the head and grabbed him. Baker continued to hold onto the pipe and defendant punched him. Baker fell to the ground and defendant kicked him in the head. Defendant had full control of the pipe at this point. Baker was lying partially on the sidewalk with his head in the gutter, motionless. Defendant moved to middle of the street, approximately 10 to 15 feet away from the gutter where Baker laid. A third person came over and checked on Baker. After a "significant amount of time," approximately 20 to 30 seconds, defendant went back to Baker, who was still lying motionless on the ground, and hit him in the head with the pipe six times. Baker sustained critical injuries.

When law enforcement arrived, Baker was lying on the sidewalk, his head on the street in a pool of blood. He had visible skull fractures and brain matter was coming out of his head. When he arrived at the hospital, he had a large open injury to his head, he was bleeding, and his brain was visible. Baker underwent surgery and died 41 days later. The pathologist concluded during the fight, Baker's brain was lacerated and portions were missing. Injuries of this sort could have only been caused by an extreme level of force. Baker could not have survived these injuries. He died from blunt trauma to the head.

At the scene, there were blood stains and brain matter on the sidewalk. A black metal pipe, approximately three feet long, was found in bushes near the freeway. It appeared to have blood and hair on it. The DNA on the pipe matched Baker.

4

During the fight, defendant was wearing a light grey sweatshirt. When first stopped by a law enforcement officer, he was wearing a black sweatshirt. Defendant denied seeing or hearing anything involving Baker. He claimed he had been at a friend's house. Later, upon seeing the surveillance images, an officer recognized defendant and arrested him.

At the police station, after waiving his *Miranda*[4] rights, defendant gave a statement. He stated he was homeless and did not have a particular place he normally stayed. He told the officers Baker had assaulted him with a pipe and was trying to beat him up. After they struggled over the pipe, defendant "[b]eat his head in with the pipe." Defendant said he hit Baker until Baker stopped moving. He indicated during the period when he had walked away from Baker, he was thinking he had to defend himself, and a "voice" asked if Baker was going to kill him. He thought Satan had told him Baker was going to get back up. Satan also told him to put the pipe in the bushes. He had no option other than to run away. Defendant had taken off the grey sweatshirt he was wearing during the fight and put it by the bus station.

The jury found defendant not guilty of murder (§ 187, subd. (a)), guilty of voluntary manslaughter (§ 192, subd. (a)), as a lesser included offense of first degree murder, and guilty of assault with a deadly weapon (§ 245, subd. (a)(1)), with a great bodily injury enhancement (§ 12022.7, subd. (a)). The trial court sentenced defendant to upper terms on both the manslaughter and assault with a deadly weapon convictions, with the latter stayed under section 654.

## II. DISCUSSION

A.      *Expert Testimony*

Defendant contends the trial court prejudicially erred in excluding the testimony of Dr. Robert Sapolsky, a neuroendocrinologist, regarding how chronic stress affects brain

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

function and development, and decisionmaking under stress. Defendant also claims the exclusion of this evidence violated his Sixth Amendment right to present a defense and his Fourteenth Amendment right to due process of law. Specifically, defendant argues the testimony was relevant to his claim of reasonable self-defense and his state of mind at various points in the fight. The People respond the trial court properly excluded the evidence as improper diminished capacity evidence, the evidence was speculative, and the evidence was irrelevant to the reasonableness of defendant's belief in the need for self-defense. We conclude any error in excluding the evidence was harmless under both state and federal standards.

### 1. Additional Background

The People made an in limine motion to exclude the testimony of Dr. Sapolsky on the subject of diminished capacity. Defense counsel responded that Dr. Sapolsky's testimony about how the brain functions under stress and extreme adversity was relevant to defendant's claim of self-defense. The court made clear diminished capacity testimony would not be allowed, but deferred ruling on the motion.

Defendant testified he had been homeless for approximately two years and subject to various incidents of violence during that time. He also testified he had not lived with his mother since he was two or three years old and had been placed in foster care.

After the prosecution's case-in-chief and defendant's testimony, the court held an Evidence Code section 402 hearing regarding Dr. Sapolsky's proposed evidence. Dr. Sapolsky is an expert in neuroendocrinology, specifically how stress affects brain function and development.[5]

Dr. Sapolsky testified there are three different levels of what occurs in the brain during decisionmaking: (1) conventional decisionmaking, which is average individuals

---

[5] There is no challenge to Dr. Sapolsky's qualifications as an expert. In fact, the court explicitly found he was an expert in his field.

under average circumstances; (2) impaired decisionmaking under stress; and (3) impaired decisionmaking under stress, where the individual has lifetime experiences of severe adversity and chronic psychosocial stress. Stress influences everyone's behavior, judgment, and executive control. Stress can include: psychological factors, such as lack of control, predictability, or social support; and physical stressors, such as life threatening situations or extreme deprivation. A person trying to make a decision in a stressful situation, as opposed to in their regular state of mind, has an impaired ability to stop their actions and reason; emotions tend to overwhelm cognition; emotions centered in fear, aggression, and anxiety dominate decisionmaking; and one falls into a habitual reflex response, rather than a reflective response.

Severe, chronic psychosocial stress effectively leaves scars on the brain that affect decisionmaking, and a history of stressful adversity further impairs decisionmaking. Sustained stress causes atrophy of the parts of the brain responsible for impulse control and emotional regulation. A variety of stressors, including childhood adversity, familial instability, witnessing abuse, and economic vulnerability can also impact brain development, biasing the person toward making more emotion driven decisions in critical stressful moments.

Early experiences, including severe stress, change how the brain develops and how it is constructed forever. Significant stress from early adversity slows development of the frontal cortex, the cognitive portion of the brain, and increases the size and excitability of the amygdala, the fear and aggression portion of the brain. Early adversity, teaches the brain to expect more adversity, perceive threat everywhere, and have difficulty detecting safety signals. Such early adverse experiences can include unstable family situations, witnessing abuse, being the victim of abuse, and having a family member who is incarcerated or substance dependent. Relatedly, these adverse experiences also include placement in a foster home and the circumstances which lead to such a placement. A two-year period of exposure to violence due to homelessness would

also likely dramatically impair impulse control, as that type of stress strengthens the amygdala and atrophies the frontal cortex. When a person with such adverse experiences and psychosocial stressors is in a life threatening situation, it would be "virtually impossible" for that person to rationally evaluate whether the threat has ended. The combination of a period of homelessness and adverse childhood experiences would likely significantly increase the impairment of brain function.

Defense counsel argued the evidence was highly relevant to how a person deals with stress when they are in a life-threatening situation, such as being attacked by a person wielding a pipe, and how the brain reacts makes it much more difficult to reason; it was not diminished capacity evidence. The People argued the evidence was invading the province of the jury and that the evidence was not necessary as reactions to stress are within the common understanding of jurors.

The trial court found Dr. Sapolsky's testimony would have been about diminished capacity, specifically that if a person has been exposed to violence while being homeless, and in a foster home because of an unstable family life, that person's ability to control his actions is affected and it is impossible for that person to know a threat has ended. In effect, the court concluded, this would essentially become a new defense for people without housing. The court concluded the issues in the case did not require a great deal of expertise. There was no evidence defendant had a mental disease or defect, and Dr. Sapolsky had not treated or examined defendant. Nor was there evidence that defendant had experienced exposure to violence that would affect his brain function. Finding there was no evidence of mental disease or defect, and that the proffered evidence was effectively diminished capacity evidence, the trial court sustained the People's objection to the testimony.

### 2. *Admissibility*

All relevant evidence is admissible, unless specifically excluded by statute. (Evid. Code, § 351.) Evidence is relevant if it is "relevant to the credibility of a witness" or has

8

"any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) "The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

Initially, we disagree with the trial court's conclusion that the entirety of Dr. Sapolsky's evidence was diminished capacity evidence. Diminished capacity evidence is evidence that a defendant's mental impairment negates the capacity to form a particular mental state required for the commission of the crime charged. Such evidence is not admissible. (§§ 25, subd. (a), 28, subd. (a).) In addition, an expert may not testify that based on a defendant's mental impairment he did not have the required mental states for the crimes charged. That question is reserved for the jury. (§ 29.) But these sections do not preclude all expert testimony about a mental condition a defendant may have, or how that condition affected him at the time of the offense; in fact, they " 'leave an expert considerable latitude to express an opinion on defendant's mental condition at the time of the offense, within the confines, of course, of its twin prohibitions: no testimony on the defendant's capacity to have, or actually having, the intent required to commit the charged crime.' (*People v. Cortes* (2011) 192 Cal.App.4th 873, 910 [(*Cortes*)], citing *People v. Coddington* [(2000)] 23 Cal.4th [529,] 583.)" (*People v. Pearson* (2013) 56 Cal.4th 393, 451 (*Pearson*).) An expert can provide a general description of a condition, or the effect of stress on a defendant's perceptions, because such a description does not go to defendant's mental state at the time of the events but, rather, gives jurors an abstract description that they can consider when deciding the ultimate issue of whether defendant

9

had the required mental state for murder. (*Pearson, supra,* at pp. 451-452; *People v. Vu* (1991) 227 Cal.App.3d 810, 814-185 (*Vu*).)

Dr. Sapolsky's testimony was not offered to show defendant did not, and could not, form the necessary mental state when he killed Baker. Indeed, Dr. Sapolsky did not offer an opinion on defendant's mental capacity or condition at all. Nor did he offer any opinion on defendant's capacity to form a specific mental state or whether defendant had actually formed the specific mental intent. Dr. Sapolsky's proffered testimony covered two areas: (1) the general effects of stress creating impaired decisionmaking; and (2) the effect of chronic stress on brain function and development, and the corresponding effect on decisionmaking and threat perception. This testimony properly related to general mental condition and function, and did not express an opinion on defendant's criminal intent when he beat Baker. (*Pearson, supra,* 56 Cal.4th at p. 451.) Such evidence is not precluded by sections 25, 28, or 29. (*Cortes, supra*, 192 Cal.App.4th at pp. 909-912.) To the extent portions of Dr. Sapolsky's testimony crossed the line into defendant's capacity to accurately evaluate the threat he faced from Baker, such as Dr. Sapolsky's conclusion that a person with similar exposure to violence and adversity would find it "virtually impossible" to rationally evaluate whether the threat has ended, the court could have excluded that testimony while admitting the other relevant portions of Dr. Sapolsky's testimony. (*Id.* at pp. 909-910.)

The People make no argument on appeal that this evidence is not the proper subject of expert testimony. The science of brain function and development are matters sufficiently beyond common experience to which expert testimony would assist the trier of fact. Having concluded this evidence was not improper diminished capacity evidence and was the proper subject of expert testimony, the remaining question then becomes whether or not the evidence was relevant.

At the time of the trial court's decision, both traditional and imperfect self-defense were at issue. Both traditional and imperfect self-defense require a defendant act with the

10

actual belief that they need to defend themselves from imminent danger to life. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1084 (*Humphrey*).) Expert testimony is relevant to demonstrate a defendant's actual perception of a threat of imminent harm. (*Id.* at p. 1082.) Evidence that would assist the jury in making this evaluation from defendant's perspective is relevant evidence. (*People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 745 (*Sotelo-Urena)*; *Vu, supra,* 227 Cal.App.3d at p. 814.) Because defendant's actual belief as to the need to use deadly force was at issue, the jury was required to evaluate that belief from defendant's perspective. (CALCRIM Nos. 505, 571.) Dr. Sapolsky's testimony was relevant to the evaluation of defendant's actual perception of imminent threat and corresponding need to use deadly force. (*Vu, supra*, at p. 814.) His testimony was also relevant to evaluating defendant's credibility as to his state of mind during the assault. (*Sotelo-Urena*, *supra*, at p. 752.)

Dr. Sapolsky should have been permitted to testify generally about the effects of stress on decisionmaking and the effects of chronic psychosocial stress and childhood adversity on brain function and development. He also should have been permitted to testify that a person with a history of chronic homelessness and associated exposure to violence, combined with specific adverse childhood experiences, could have altered brain function and development, and could tend to misperceive threat and react impulsively under certain particular circumstances. Such testimony would be factual testimony properly related to defendant's general mental condition, and not an expression of opinion on defendant's criminal intent. (See *People v. Nunn* (1996) 50 Cal.App.4th 1357, 1365; *Cortes, supra,* 192 Cal.App.4th at pp. 910-911; *Pearson, supra,* 56 Cal.4th at p. 451; *Vu, supra,* 227 Cal.App.3d at p. 814.)

### 3. Prejudice

#### a. Standard of Prejudice

Defendant claims his federal constitutional rights to present a defense and to due process error under the Sixth and Fourteenth Amendments were violated by the trial

court's exclusion of Dr. Sapolsky's testimony, and therefore, we must reverse unless the error was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24.)

We reject defendant's claim of federal constitutional error, as it "attempt[s] to inflate garden-variety evidentiary questions into constitutional ones." (*People v. Boyette* (2002) 29 Cal.4th 381, 427 (*Boyette*).) "[O]nly evidentiary error amounting to a complete preclusion of a defense violates a defendant's federal constitutional right to present a defense." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4; see also *Boyette, supra,* at p. 427.) Generally, application of the " ' "ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." ' " (*Boyette, supra,* at pp. 427-428.) If the trial court erred, the error was not a " ' "refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense." ' " (*Id.* at p. 428.)

The exclusion of Dr. Sapolsky's testimony did not preclude defendant from presenting a defense. Defendant made his claim of self-defense and testified extensively as to his state of mind during the fight, specifically his belief that he needed to defend himself from Baker and his fear that Baker was going to kill him. By arguing Dr. Sapolsky's testimony would have "significantly assisted [the] affirmative defense" and would have corroborated defendant's extensive testimony as to his state of mind during the fight with Baker, defendant's briefing implicitly acknowledges he was not precluded from presenting a defense. Because the trial court's ruling did not preclude defendant from presenting his claim of self-defense, any error in excluding all of Dr. Sapolsky's testimony is properly reviewed under the state law standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

b.      *Testimony re: Effect of Acute Stress on Average Person*

A brief portion of Dr. Sapolsky's testimony generally explained the effect of stress, and a stressful situation, on an average person's decisionmaking abilities. To the extent this testimony was relevant in that it had some tendency to prove how a reasonable

12

person would have responded to Baker's assault and possibly corroborated defendant's testimony as to his state of mind, the error in excluding this evidence was harmless.

Dr. Sapolsky's proffered testimony indicated an average person under acute physical stress, such as being chased by a lion, would not be able to stop and reason and instead would act reflexively. But, this testimony did not align with the evidence of defendant's actions. Dr. Sapolsky's testimony did not address how long a person's decisionmaking abilities are impaired *after* cessation of the acute physical stressor, that is when the person is no longer acting under the stress of an immediate threat. The video evidence showed that defendant hitting Baker repeatedly with the pipe was not a reflexive reaction to an acute stressor or a decision made in the throes of the stressful situation. Rather, defendant acted 20 to 30 seconds after the fight had stopped. Defendant had possession of the weapon. Defendant walked 10 to 15 feet away from Baker, who was motionless on the ground. The situation had abated sufficiently that a third person came over to check on Baker. It was after this significant break from the acute physical stressor, during which defendant had both time and space for reflection, that defendant acted with fatal force and repeatedly hit Baker in the head with the pipe. In short, when defendant made the decision to hit Baker repeatedly with the pipe the imminent threat of injury, the acute physical stress, posed by Baker's assault had ended; he was no longer acting under the acute physical stress described by Dr. Sapolsky's testimony on this point. It is not reasonably probable on these facts that the jury would have found a reasonable person in defendant's position would have found it necessary to hit Baker six times in the head with a pipe while he was lying motionless on the ground. Accordingly, the error in excluding this testimony was not prejudicial.

c.      *Testimony re: Effects of Chronic Stress*

The bulk of Dr. Sapolsky's testimony related to the effects of chronic stress on brain function, decisionmaking, and threat perception. Because defendant was not convicted of murder, he was convicted of voluntary manslaughter, to be prejudicial this

13

testimony would have had to be relevant to the objectively reasonable requirement of traditional self-defense; that is, what would a reasonable person with defendant's knowledge believe in the situation? (*Humphrey, supra,* 13 Cal.4th at p. 1087.)

The reasonable person standard takes into account what would appear necessary to a reasonable person in defendant's position, considering all the facts and circumstances known to defendant. (*Humphrey, supra,* 13 Cal.4th at pp. 1082-1083.) This includes facts and circumstances that create a heightened sensitivity and increased ability to *accurately* predict impending violence, such as intimate partner battering (*id*. at pp. 1083-1086 [defendant's intimate knowledge of, and experiences with, the batterer may make them better able to predict whether force is reasonably necessary]) and chronic homelessness (*Sotelo-Urena, supra,* 4 Cal.App.5th at pp. 746-751 [chronically homeless people are subjected to violent crime at significantly higher rate than the general population which affects their knowledge about the need to use lethal force]). But, the reasonable person standard does not take into account circumstances that increase a person's propensity to *misperceive* threats of violence. (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014-1017 (*Brady*); *Humphrey, supra,* at p. 1083; *Sotelo-Urena, supra,* at p. 751.) The standard does not ask how a reasonable person with defendant's particular background, stress experiences, and brain function abnormalities, which led him to misinterpret and overreact to events, would have acted in the situation. (*People v. Steele* (2002) 27 Cal.4th 1230, 1254-1255 (*Steele*).) " 'The issue is not whether defendant, or a person like him, had reasonable grounds for believing he was in danger.' (*People v. Jefferson* (2004) 119 Cal.App.4th 508, 519.) It is instead 'whether a person of ordinary and normal mental and physical capacity would have believed he was in imminent danger of bodily injury under the known circumstances.' (*Id*. at p. 520.)" (*Brady, supra,* at pp. 1014-1015.)

Dr. Sapolsky's testimony related to chronic stress offered possible explanations for defendant's misperception of events, the degree of threat he faced, his reactions to

14

those events, and his inability to accurately perceive when the threat had stopped. This testimony was relevant to defendant's subjective beliefs, not his objective beliefs. Dr. Sapolsky's proffered testimony did not suggest that defendant had *accurately* perceived the threat he faced and reacted in accordance with that accurate perception. The type of evidence offered here, that uses a defendant's personal history to explain an overreaction to misperceived threats or an inability to control one's actions, does not go to the objective element of a self-defense claim. Rather, the evidence goes to defendant's subjective beliefs; that is, defendant actually perceives threat, but that perception is not reasonable. (*Steele, supra,* 27 Cal.4th at pp. 1254-1255; *Brady, supra,* 22 Cal.App.5th at p. 1018; *Jefferson, supra,* 119 Cal.App.4th at pp. 519-520.) In acquitting defendant of murder, but convicting him of manslaughter, the jury necessarily accepted defendant's testimony of his subjective beliefs of danger or provocation, but concluded those beliefs were not objectively reasonable. (*Vu, supra,* 227 Cal.App.3d at pp. 814-815; *Steele, supra,* at pp. 1252-1253 [heat of passion has both objective and subjective component].) Because this evidence did not go to the objective component of self-defense, it is not reasonably probable that the jury would have acquitted defendant of voluntary manslaughter if the evidence had been admitted.

B.      *Jury Instruction - Defense of Home*

Defendant next contends the trial court committed prejudicial error by refusing to instruct the jury with the requested instruction on justifiable homicide in defense of the home, CALCRIM No. 506. Defendant also raises federal constitutional claims under the Second Amendment "right to defend his home" and Fourteenth Amendment right to due process and a fundamentally fair trial. The People argue there was insufficient evidence to justify giving the instruction, as defendant was attacked on public property. The People also argue any error was harmless. We need not address whether the alcove of the human services agency building qualified as a residence for purposes of giving CALCRIM No. 506, as we find any error harmless.

15

*1.  Additional Background*

The parties and court agreed the court would instruct the jury with justifiable homicide in self-defense, CALCRIM No. 505.[6]  That instruction provides a homicide is

---

[6]  CALCRIM No. 505 as given provides:  "The defendant is not guilty of (murder/ [or] manslaughter) if (he) was justified in (killing) someone in (self-defense).  The defendant acted in lawful (self-defense) if:

"1.  The defendant reasonably believed that (he) was in imminent danger of being killed or suffering great bodily injury;

"2.  The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;

"AND

"3.  The defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.  The defendant must have believed there was imminent danger of death or great bodily injury to (himself).  Defendant's belief must have been reasonable and (he) must have acted only because of that belief.  The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation.  If the defendant used more force than was reasonable, the killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed.  If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"[If you find that Frank Baker threatened or harmed [others] in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.]

"[If you find that the defendant knew that Frank Baker had threatened or harmed others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.]

"[A defendant is not required to retreat.  He is entitled to stand his ground and defend himself and, if reasonably necessary, to pursue an assailant until the danger of (death or great bodily injury) has passed.  This is so even if safety could have been achieved by retreating.]

"[*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.]

16

justified if defendant: reasonably believes he is defending himself from imminent threat of being killed or suffering great bodily injury; reasonably believes the use of deadly force is necessary; and uses no more force than necessary.

Defense counsel requested the trial court also instruct the jury with CALCRIM No. 506, justifiable homicide in defense of residence.[7] That instruction provides a

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of (murder/ [or] manslaughter)."

[7] CALCRIM No. 506: "The defendant is not guilty of (murder/ [or] manslaughter/attempted murder/ [or] attempted voluntary manslaughter) if (he/she) (killed/attempted to kill) to defend (himself/herself) [or any other person] in the defendant's home. Such (a/an) [attempted] killing is justified, and therefore not unlawful, if:

"1. The defendant reasonably believed that (he/she) was defending a home against <insert name of decedent>, who (intended to or tried to commit <insert forcible and atrocious crime>/ [or] violently[[,] [or] riotously[,]/ [or] tumultuously] tried to enter that home intending to commit an act of violence against someone inside);

"2. The defendant reasonably believed that the danger was imminent;

"3. The defendant reasonably believed that the use of deadly force was necessary to defend against the danger;

"AND

"4. The defendant used no more force than was reasonably necessary to defend against the danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of violence to (himself/herself/ [or] someone else). Defendant's belief must have been reasonable and (he/she) must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, then the [attempted] killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"[A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant

17

homicide is justified if a defendant: reasonably believes they are defending themselves or another person in defendant's home against a person intending to trying to commit a "forcible or atrocious" crime or to violently enter the home to commit an act of violence against someone inside the home; reasonably believes the danger is imminent; reasonably believes the use of deadly force is necessary; and uses no more force than necessary.

The trial court asked for authority that the alcove of the human services agency building qualified as a residence, and defense counsel could not provide any. However, defense counsel argued it should qualify as defendant "was going to reside" there that night and had "resided" there previous nights.

At the instruction conference, defense counsel again argued defendant had been living at the entrance of the human services agency building for a number of nights, his sleeping bag was out, he was standing in front of it when he was attacked by Baker, and he was planning to sleep there. Considering defendant's circumstances, he argued the instruction was appropriate.

The court noted there were no family members involved in this assault and it was giving the instruction that defendant had no duty to retreat. The court also noted, if the alcove was a home for defendant, it was one for Baker as well. The court opined if defendant had been protecting his family against a forcible or atrocious crime, he would be entitled to the instruction. The court concluded in this case, there was minimal difference between this instruction and the standard self-defense instruction. Accordingly, the court denied the request to give the instruction.

---

until the danger of (death/bodily injury/ <insert forcible and atrocious crime>) has passed. This is so even if safety could have been achieved by retreating.]
 "The People have the burden of proving beyond a reasonable doubt that the [attempted] killing was not justified. If the People have not met this burden, you must find the defendant not guilty of [attempted] (murder/ [or] manslaughter)."

18

2.      *Analysis*

"In a criminal case, a trial court must instruct on the general principles of law relevant to the issues raised by the evidence." (*People v. Earp* (1999) 20 Cal.4th 826, 885.) "Included within this duty is the '. . . obligation to instruct on defenses, . . . and on the relationship of these defenses to the elements of the charged offense . . .' where '. . . it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense.' " (*People v. Stewart* (1976) 16 Cal.3d 133, 140.) A trial court's failure to instruct on potential defenses is not prejudicial if the jury necessarily resolved the factual issue adversely to the defendant under other instructions. (*People v. Sedeno* (1974) 10 Cal.3d 703, 720-721, disapproved on other grounds in *People v. Breverman* (1998) 19 Cal.4th 142, 163, fn.10; *Stewart, supra,* at p. 141.)

As an initial matter, the proper harmless error standard to apply when a trial court errs in failing to properly instruct on any of the related theories of self-defense, defense of others, or defense of habitation is unsettled. (See *People v. Rhodes* (2005) 129 Cal.App.4th 1339, 1347 [error in failing to instruct with general self-defense instruction was subject to *Chapman* harmless error standard]; compare with *People v. Elize* (1999) 71 Cal.App.4th 605, 616 [utilizing *Watson* as standard when the trial court failed to properly instruct on self-defense or defense of others.]) Defendant contends his right to an instruction on defense of habitation is protected under the Second and Fourteenth Amendments, which triggers review under *Chapman*. We conclude that even under the more demanding standard for federal constitutional error set forth in *Chapman*, defendant has not established prejudice in failing to instruct with CALCRIM No. 506. (See *People v. Clark* (2011) 201 Cal.App.4th 235, 251 [concluding that omission of self-defense instruction was harmless under any standard].)

The trial court instructed the jury that the homicide was justified if defendant reasonably believed he was defending himself from imminent threat of being killed or suffering great bodily injury and acted reasonably in responding to that threat with deadly

19

force.  In convicting him of voluntary manslaughter, the jury necessarily rejected that claim of reasonableness of both perception and action.  That is precisely the factual issue the jury would have resolved in determining whether the homicide was justified in defense of defendant's home.  To the extent there are differences in the two instructions, defendant makes no argument those differences were relevant to the jury's determination in this case and identifies no factual issue that was not resolved by the self-defense instruction.  There is no evidence defendant sought to defend someone other than himself or that he was defending himself from any threat other than that of being killed or sustaining great bodily injury.[8]  Under the facts of this case, defendant suffered no prejudice as a result of the refusal to instruct on justifiable homicide in defense of home.

C.      *Senate Bill 567 Amendments to Section 1170*[9]

While this appeal was pending, Senate Bill 567's amendments to section 1170 became effective.  As amended, section 1170, subdivision (b) permits imposition of an upper term sentence "only when there are circumstances in aggravation of the crime that justify" the upper term and only if "the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."  (§ 1170, subd. (b)(2).)  However, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury."  (*Id.*,

---

[8]  A forcible or atrocious crime, as indicated in CALCRIM No. 506 is a crime such as murder, mayhem, rape, and robbery.  (*People v. Ceballos* (1974) 12 Cal.3d 470, 478.) Language regarding defense of others and threat of forcible or atrocious crime is also part of the standard CALCRIM No. 505.  Without objection, that language was stricken from the instruction given.

[9]  We raise this issue on our own as the need for resentencing is clear, and the People have conceded the issue in similar cases.  (See, e.g., *Flores, supra,* 73 Cal.App.5th at p. 1039.)

20

subd. (b)(3).) Additionally, as relevant here, section 1170, subdivision (b)(6) provides: "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances [and] that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense." (See § 1016.7, subd. (b) ["A 'youth' for purposes of this section includes any person under 26 years of age on the date the offense was committed"].)

Senate Bill 567 "applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal." (*Flores, supra,* 73 Cal.App.5th at p. 1039.)

The trial court imposed the upper term on the voluntary manslaughter conviction and imposed and stayed the upper term on the assault with a deadly weapon and great bodily injury enhancement. In imposing the upper term, the trial court did not explicitly indicate any aggravating factors it was relying on, but noted the beating inflicted by defendant was "vicious" and concluded the upper term was warranted "in light of all the facts, all the circumstances in this case." No factor in aggravation supporting the upper term sentences was stipulated to by defendant or found true beyond a reasonable doubt by the jury. (§ 1170, subd. (b)(2).) Defendant had no prior record. Further, at the time of the offense, January 2019, defendant was 25 years old; that is, he was statutorily defined as a youth.[10] (§ 1170, subd. (b)(6)(B).)

---

[10] In addition, the record reflects defendant may also have "experienced psychological, physical, or childhood trauma including, but not limited to, abuse, neglect, exploitation, or sexual violence."

Under the circumstances, we will vacate the sentence and remand to allow compliance with the current requirements of section 1170. (See *Flores, supra*, 73 Cal.App.5th at p. 1039 ["Undisputedly, defendant was under age 26 when he committed this crime. Accordingly, we agree with the parties that under section 1170, subdivision (b), defendant's six-year midterm sentence must be vacated"].)

## III. DISPOSITION

The convictions are affirmed. The sentence is vacated and the matter is remanded for full resentencing.


/S/

_____
RENNER, J.



We concur:


/S/

_____
HOCH, Acting P. J.


/S/

_____
KRAUSE, J.