Filed 5/14/24  P. v. Burns CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D081051 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN410155) |
| JOHN CHRISTOPHER BURNS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Brad A. Weinreb, Judge.  Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant John Christopher Burns and Jose De Jesus Martinez were part of the same homeless community. After a friend gave Burns a valuable bike, Martinez began causing him trouble. Martinez once tried to steal the bike, punching Burns in the mouth and knocking out some of his teeth in the process. A few weeks later, he tried to steal the bike again. Burns confronted him, and the altercation ended in Burns fatally stabbing him in the neck. At trial, Burns claimed self-defense. The jury rejected the defense and convicted him of second-degree murder. He was sentenced to 35 years to life in prison.

Burns raises several issues on appeal. He argues the trial court erred in instructing the jury on self-defense, in denying his posttrial motion to release juror identifying information, and in admitting evidence of his prior convictions and misconduct. He further asserts the prosecutor erred in cross-examining him regarding one such prior conviction. Finally, he contends the court erred in refusing to dismiss his prior strike and prior serious felony enhancement, and violated due process in declining to stay fines and fees based on his inability to pay. For various reasons we explain, we reject his claims and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

One evening in late January 2020, Burns found an acquaintance, Katherine M., sitting on the patio outside a Burger King. She agreed to watch his bike when he went to use the restroom. While Burns was inside the Burger King, Martinez approached Katherine. She might have met him once before but did not know him well. He said the bike belonged to him and tried to take it. Katherine refused to give Martinez the bike. He warned her "to be careful about the bike" or that "trouble was going to come from the

2

bike," but said he respected her and walked away. Katherine felt threatened by the encounter.

When Burns returned from the restroom, Katherine told him someone tried taking the bike. Upset, Burns walked into the parking lot and screamed, "Who the fuck was trying to take my bike?" Martinez confronted Burns near some gas station air pumps about 100 feet away from the Burger King patio. They began arguing loudly. Burns walked away from Martinez, back toward the patio, and Martinez followed. According to Katherine, Burns challenged him, "take the bike then, take the bike." Martinez said he would. Burns then stabbed him in the neck.

After Burns challenged Martinez, Katherine began "scooting away" to avoid getting caught in any scuffle. She did not see either man with a weapon and she did not see the stabbing. She knew Burns had a "terrible temper" but never saw him threaten anyone with a knife. She was generally aware that many people in the homeless community carried knives or weapons. After the stabbing, Katherine learned that Martinez had been violent towards other members of the community.

Surveillance cameras in the area captured the events up until Burns rejoined Katherine on the patio and discussed her interaction with Martinez. They also captured Martinez following Burns back to the patio. However, a large fuel truck and other cars blocked some or all of the view during the critical argument and the stabbing. The cameras later captured bystanders aiding Martinez on the patio.

When police responded to the scene, Martinez was alive but bleeding profusely. His breathing was shallow and infrequent. Police did not find any weapons on Martinez or in the patio area. Paramedics transported Martinez

to the hospital where he was pronounced dead shortly after arriving. Police located and arrested Burns the following evening at a nearby casino.

An autopsy revealed that Burns stabbed Martinez in his left jugular vein and carotid artery. The wound was almost two inches deep. At the time of his death, Martinez had methamphetamine in his system in an amount consistent with being under the influence. At trial, a toxicologist explained that the effects of methamphetamine can include erratic behavior, loss of judgment, violence, aggression, delusions, paranoia, and psychosis. Someone who is "very high" on methamphetamine might even exhibit "heightened strength and reflexes."

At trial, Burns claimed self-defense. To explain his state of mind and background, Burns told the jury a bit of his personal story. He had been homeless off and on since he was six years old. He struggled to find work due in part to his extensive tattoos. He got his first tattoo at nine years old in a group home. Burns described his experience being homeless as difficult and stressful. Among people in the homeless community there is a lack of trust. Robbery, assault, and theft is common. "You don't want people knowing where you sleep because they'll attack you" and "take your stuff." Burns had been in a "couple of fistfights" and had his property stolen, including multiple bikes and a tent. In his experience, homeless people commonly carried weapons for protection.

There is also distrust between the homeless community and the police. As Burns explained, "we are harassed by the police constantly for no other reason than being homeless." "If we sit down, we're illegal lodging" and "if you have more than a backpack, they confiscate it and give you a ticket for it for illegal storage" on public property. In his experience, the police do not take crimes against homeless victims seriously. Burns once heard an officer

4

refer to an offense within the homeless community as an "asshole-on-asshole crime." Because of this, and to avoid being known as a "rat," individuals within the homeless community often do not report crimes to the police.

Burns also told the jury about a time, in December 2014, when he was the victim of a violent robbery. He pulled over to help someone on the side of the road with their flashers on. The next thing he knew, he was in an ambulance going to the hospital. He was stabbed four times on his head, requiring 34 staples. His wedding ring, watch, and wallet were stolen. This experience made him leery and distrustful of the people around him.

Turning to the incident in question, Burns explained that he met Martinez about five or six months before the stabbing. When they met, Martinez was working at a convenience store. At the end of his shifts, Martinez would give food to Burns and others in the homeless community. However, during that five- or six-month period, Martinez became homeless as well. He began spending time in the same areas as Burns, so they saw each other often.

Over time, Burns noticed that Martinez became very confrontational and violent when drinking alcohol, and paranoid and delusional when using methamphetamine. For instance, Martinez believed people from city hall planted a device in his head that recharged when the police handcuffed him. Burns personally saw him get into three altercations. On one occasion, Martinez threatened to have a woman beaten until she gave him her backpack. He "always" had knives and, at one point, a gun. He claimed he would "shoot the next cop that pulled him over because he was tired of getting fucked with." At that time, Burns was not afraid of Martinez but began avoiding him.

5

Sometime in the fall of 2019, Burns was gifted a rare, valuable bike. Multiple people tried to buy or steal the bike. In January 2020, two or three weeks before the stabbing, Burns had the bike locked to the rail of a bridge while he repaired a tire. Martinez approached Burns, said that someone paid him to take the bike, and hit Burns in the mouth, knocking out two of his teeth. After that, he did not try to find Martinez or seek revenge. He did not want to be around someone so "volatile" and "unpredictable." However, about a week later, he rode his bike past a group of men including Martinez. Martinez yelled, "hey, fool," then someone threw a 40-ounce beer bottle at Burns. It whipped passed his head and shattered in front of his bike. He turned around and saw they were chasing him. Thinking they were about to jump him, he pedaled as fast as he could to get away.

The next time Burns saw Martinez was at the Burger King. That evening, Burns asked Katherine to watch his bike while he used the restroom. When he came back outside minutes later, she said that "some guy pushed up on her and tried to take [his] bike." Burns felt irritated and frustrated. He asked who it was. She said she did not know the man, but he was over by the air pumps. Burns admitted he walked into the parking lot and yelled, "Who the fuck is trying to take my bike?" He wanted to handle the matter right then and there to avoid showing weakness. He explained to the jury: "If you are weak on the streets in the environment we run in, you are going to be a victim constantly." Burns continued across the parking lot. Suddenly, Martinez ran out from behind a large fuel truck, got in his face, and said he was taking the bike.

Feeling surprised, afraid, and anxious, Burns immediately walked away. Martinez followed Burns all the way back to the patio, calling him names and grabbing onto his shirt or jacket. Burns told Martinez, "You are

not taking my bike." Martinez responded: "Well, fuck it. I'll just smoke your punk ass." Knowing Martinez had a gun before, Burns believed he was about to be shot.

Burns patted his pants and realized he still had a pair of broken scissors in his pocket that he used to repair his bike seat. With his left hand, Martinez yanked the bike towards him. Burns lost sight of his right hand behind his body. Based on what he knew about Martinez, he believed Martinez could be reaching for a weapon. His "instinct" or "reaction" was to swing at Martinez with the scissors. Burns denied challenging him to take the bike or stabbing him over the bike. Rather, he "was scared of the situation that [he] was in" at that moment.

Burns immediately fled the area. He felt remorseful. He used drugs to try to "deal with the situation" and "escape it." Eventually, he decided to turn himself in. He went to the casino, planning to see his daughter who lived nearby and turn himself in the next morning.

The prosecution charged Burns with murder (Pen. Code, § 187, subd. (a))[1] and alleged that he personally used a deadly and dangerous weapon during the offense (§ 12022, subd. (b)(1)). The prosecution further asserted that he suffered one prior strike (§§ 667, subds. (b)–(i), 1170.12) and one prior serious felony conviction (§ 667, subd. (a)(1)). A jury convicted Burns of second-degree murder and found true the weapon allegation. In a bifurcated proceeding, Burns admitted the prior strike and prior serious felony conviction.

---

[1]     Further undesignated statutory references are to the Penal Code except as specified in part C of the Discussion.

7

At sentencing, the trial court declined to dismiss the prior strike or prior serious felony enhancement, but agreed to dismiss the weapon enhancement. The court sentenced Burns to 15 years to life for the murder, doubled to 30 years to life under the Three Strikes law, plus five years for the prior serious felony, for an aggregate term of 35 years to life.

## DISCUSSION

### A. *The trial court committed no prejudicial error in giving the jury an unwarranted pinpoint instruction regarding self-defense.*

Burns principally contends the trial court erred and violated his constitutional rights to due process, to a jury trial, and to present a complete defense by adding pinpoint language to the instruction on self-defense (CALCRIM No. 505) at the request of the prosecution.

### 1. *Additional background*

As relevant here, the self-defense instruction stated:

> "The defendant is not guilty of murder if he was justified in killing someone in self-defense. The defendant acted in lawful self-defense if:

> "1. The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury or was in imminent danger of being robbed;

> "2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger;

> AND

> "3. The defendant used no more force than was reasonably necessary to defend against that danger."

> "The defendant must have believed there was imminent danger of death or great bodily injury to himself. The defendant's belief must have been reasonable and he must have acted only because of that belief. . . ."

8

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed." (CALCRIM No. 505.)

The prosecutor asked the court to add the following language:

"In determining how a reasonable person would act, you cannot consider as a circumstance a mental state unique to the defendant which affected his ability to perceive the situation. You are to consider how a reasonable person in the defendant's position seeing and knowing the same facts would act."

The prosecutor represented that this pinpoint language was "sanctioned by" our court in *People v. Brady* (2018) 22 Cal.App.5th 1008 (*Brady*) "in the context of the defendant's own past and hypervigilance." He contended this language was warranted to the extent Burns would argue his previous experience being robbed caused him to be hypervigilant. The prosecutor also noted that Burns discussed "his own personal mental state, his own personal history," and "his own personal beliefs" in his testimony. Defense counsel maintained that the pinpoint was not appropriate given the evidence before the jury and that the standard instruction sufficed.

The court reviewed *Brady* and confirmed that the pinpoint language accurately stated the law. It did not find the language argumentative or completely duplicative, as the standard instruction did not "necessarily reflect on any issues of mental state or deficiencies or anything specific and unique to the defendant[,] i.e., subjective application." The court also found the pinpoint was supported by the evidence—namely, testimony from Burns and law enforcement about homelessness, how chronic homelessness affected

9

Burns, and how it affected others in the community.  The court observed "that the reasonable person standard is not modified by evidence of the defendant having chronic homelessness or anything unique to the defendant. It's how a reasonable person in that position having those same experiences would act, not necessarily the defendant alone."  To the extent the defense could argue Burns's actions "were motivated by his own beliefs and his homeless condition," the court thought the pinpoint was appropriate here.

Since the court decided to give the prosecution's pinpoint language, Burns requested additional language from *Brady*.  The court declined to include requested language stating:  "The reasonable person standard takes into account the defendant's knowledge that may increase his or her ability to accurately predict impending violence."  The court found this language "somewhat argumentative" and too confusing for the jury.  However, the court agreed to add the following paragraph:

> "The reasonable person standard includes the point of view of a reasonable person in the position of the defendant taking into account all the elements of the case which might be expected to operate on his mind."

2.    *Self-defense requires objective reasonableness.*

"California law separates criminal homicide into two classes:  the greater offense of murder and the lesser offense of manslaughter."  (*People v. Schuller* (2023) 15 Cal.5th 237, 252.)  Murder is an unlawful killing with malice aforethought (§ 187, subd. (a)) while manslaughter is an unlawful killing without malice (§ 192).  There are three types of manslaughter: voluntary, involuntary, and vehicular.  (§ 192.)  Two factors may negate malice and reduce a crime that would otherwise be murder to voluntary manslaughter:  heat of passion and "imperfect" self-defense.  (*People v. Elmore* (2014) 59 Cal.4th 121, 133 (*Elmore*).)

10

When a defendant actually and *reasonably* believes the use of deadly force is necessary to defend himself from imminent threat of death or great bodily injury, the defendant acts in perfect self-defense. His or her killing is justified and not criminal. (*Elmore, supra,* 59 Cal.4th at pp. 133–134, citing § 197.) When a defendant actually but *unreasonably* believes the use of deadly force is necessary, the defendant acts in imperfect self-defense. Imperfect self-defense is not a complete defense to a killing, but negates malice and reduces the offense to voluntary manslaughter. (*Elmore,* at p. 134.)

" 'The subjective elements of self-defense and imperfect self-defense are identical. Under each theory, the [defendant] must actually believe in the need to defend . . . against imminent peril to life or great bodily injury.' " (*People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 744 (*Sotelo-Urena*).) To determine whether the belief in the need for self-defense was objectively reasonable, "a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge.' " (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082–1083 (*Humphrey*).) The jury must assume " 'the point of view of a reasonable person in the position of the defendant,' " taking into account " 'all the elements in the case which might be expected to operate on his mind.' " (*Id.* at p. 1083.)

Accordingly, evidence that illustrates the defendant's situation and knowledge can be relevant to reasonableness. (See *Humphrey, supra,* 13 Cal.4th at p. 1094 (conc. opn. of Brown, J.) ["the objective component is not measured by an *abstract* standard of reasonableness but one based on the defendant's perception of imminent harm or death" (italics added)].) For example, a defendant claiming self-defense may present evidence that the victim previously threatened or attacked the defendant, or had a reputation

11

for violence known to the defendant. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1060, 1065–1066 (*Minifie*); *People v. Davis* (1965) 63 Cal.2d 648, 656.) " 'Common sense and experience tell us that it is reasonable for a person threatened by another to be on heightened alert upon encountering that threatener, and to reasonably take [the threat] into account in deciding the necessity for, and the amount of, defensive action, in response to any act on the part of the threatener reasonably appearing to be calculated to carry out that threat.' " (*Minifie*, at p. 1065.) A defendant is entitled to corroborate their testimony that they feared for their life by proving the reasonableness of such fear, and prior threats or acts of violence would tend to make the defendant fearful. (*Id.* at pp. 1065–1066; *Davis*, at pp. 656–657.)

One variation of this type of evidence can be found in domestic violence cases, where defendants may offer testimony describing intimate partner battering to prove the reasonableness of their response to a perceived threat from the victim. (*Humphrey*, *supra*, 13 Cal.4th at pp. 1088–1089.) Such evidence describes "the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence." (Evid. Code, § 1107, subd. (a).) Through the experience of prolonged abuse, a victim of domestic violence can become " 'attuned to [their] abuser's pattern of attacks' " and learn " 'to recognize subtle gestures or threats that distinguish the severity of attacks and that lead [them] to believe a particular attack will seriously threaten [their] survival.' " (*Humphrey*, at p. 1097 (conc. opn. of Brown, J.).) A victim may be able to recognize warning signs that might be imperceptible or appear innocuous to an outsider, such as a look in the eye, footstep, or tone of voice. (*Id.* at pp. 1099 & 1102 (conc. opn. of Brown, J.).) As a result, the victim becomes " 'particularly able to predict accurately the likely extent of violence in any attack' " against them.

12

(*Id*. at p. 1097 (conc. opn. of Brown, J.).)  Understanding this form of hypervigilance can significantly affect the jury's evaluation of the reasonableness of the defendant's fear for their life.  (*Id*. at pp. 1097, 1099 (conc. opn. of Brown, J.).)

Testimony explaining chronic homelessness may be similarly relevant. (*Sotelo-Urena*, *supra*, 4 Cal.App.5th at pp. 750–752.)  Studies show that homeless individuals are subject to substantially higher rates of violence than the general population.  (*Id*. at p. 742.)  Violent attacks against the homeless—including unprovoked shootings, stabbings, and beatings—come from both housed and unhoused individuals.  (*Id*. at pp. 747–748.)  This vulnerability "tends to create a greater than normal sensitivity to perceived threats of violence" among the homeless community.  (*Id*. at p. 742.) Given this heightened sensitivity, a jury may find a defendant "was ' "justified in acting more quickly and taking harsher measures for [their] own protection" ' " in the event of an attack if they were chronically homeless. (*Id*. at p. 751.)

In assessing reasonableness, the jury must consider what a reasonable person in a similar situation with similar knowledge would believe. (*Humphrey*, *supra*, 13 Cal.4th at pp. 1082–1083.)  Evidence that adds color to that situation and knowledge can help the jury imagine how a reasonable person in the defendant's position might interpret the victim's behavior, and in turn, the level of danger presented.  (See *Minifie*, *supra*, 13 Cal.4th at p. 1069.)  Such evidence also explains the defendant's knowledge that may increase his or her ability to accurately perceive actual threats of violence from the victim.  (See *Brady*, *supra*, 22 Cal.App.5th at pp. 1010, 1017.)

Still, the ultimate question remains what a reasonable person would believe.  (*Humphrey*, *supra*, 13 Cal.4th at p. 1087.)  The question never

13

becomes what a reasonable battered partner, or what a reasonable homeless person would believe. (*Ibid.*; *Sotelo-Urena*, *supra*, 4 Cal.App.5th at pp. 751–752.) Accordingly, in *People v. Jefferson* (2004) 119 Cal.App.4th 508, 516 (*Jefferson*), the Third Appellate District held that evidence of the defendant's mental condition was not relevant to reasonableness. There, the defendant kicked three correctional officers while incarcerated in the mental health unit of a prison. (*Id.* at pp. 511–512.) The defendant was diagnosed with schizophrenia, bipolar disorder, and antisocial personality disorder. (*Id.* at pp. 514–515.) At trial, he testified he heard voices telling him the officers would hurt or kill him, so he kicked the officers away. (*Id.* at pp. 512–513.)

"The trial court instructed the jury on self-defense pursuant to CALJIC No. 5.30, stating in pertinent part: 'It is lawful for a person who is being assaulted to defend himself from attack if, as a reasonable person, he has grounds for believing and does believe that bodily injury is about to be inflicted upon him. In doing so, that person may use all the force and means which he believes to be reasonably necessary and which would appear to a reasonable person in the same or similar circumstances to be necessary to prevent injury which appears imminent.' " (*Jefferson*, *supra*, 119 Cal.App.4th at pp. 517–518.) During deliberations, the jury asked if it could consider the defendant's "mental state as one of the 'circumstances' referenced in CALJIC No. 5.30." (*Id.* at p. 518.) With approval from the parties, the court replied:

> "In determining how a reasonable person would act, you cannot consider as a circumstance a mental state unique to the defendant which affected his ability to perceive the situation. You are to consider how a reasonable person in the defendant's position and with his knowledge would act." (*Ibid.*)

The appellate court saw no error in the instruction. (*Jefferson*, *supra*, 119 Cal.App.4th at pp. 510, 518–519.) As the court reasoned, the issue was

14

"not whether defendant, or a person like him, had reasonable grounds for believing he was in danger." (*Id*. at p. 519.) It was "whether a 'reasonable person' in defendant's situation, seeing and knowing the same facts, would be justified in believing he was in imminent danger of bodily harm." (*Ibid*.) "By definition," the court opined, "a reasonable person is not one who hears voices due to severe mental illness." (*Ibid*.) The defense could not redefine the reasonable person "as a mentally ill person hearing voices." (*Id*. at p. 520.)

Similarly, in *Brady*, *supra*, 22 Cal.App.5th 1008, we held that evidence of a defendant's personal attributes that rendered him or her more likely to *misperceive* threats of violence was not relevant to reasonableness. (*Id*. at p. 1010.) In that case, defendant Brady sold the victim jewelry. (*Id*. at p. 1011.) The next day, the victim threatened to stab Brady with his "kazoo"—which Brady understood to mean a knife—if Brady did not refund his money. (*Ibid*.) As the victim "turned his gaze away from Brady and looked off into the distance," Brady suddenly stabbed him. (*Ibid*.) At trial, Brady presented evidence of his background, including years of child abuse, other attacks against him, substance abuse, and diagnoses including bipolar disorder and posttraumatic stress disorder (PTSD). (*Id*. at p. 1013.) An expert explained that "individuals with PTSD are usually hypervigilant, i.e., 'constantly on guard to [their] surroundings,' and often 'misperceive situations' when in 'that heightened state of arousal PTSD produces.' 'They would misperceive slights that we would probably let roll off our back as grand insults. They would be ready to fight with very little provocation.' " (*Ibid*.)

We rejected Brady's argument "that the objective inquiry adopts the standpoint of a reasonable person 'with [his] background of trauma, abuse,

15

mental illness, and physical limitations.' " (*Brady*, *supra*, 22 Cal.App.5th at pp. 1014–1015.)  The inquiry is not "what would a reasonable Brady do?" (*Id*. at p. 1010.)  And it is not whether his conduct was understandable given his background and mental state.  (*Id*. at pp. 1015–1016; see *Humphrey*, *supra*, 13 Cal.4th at p. 1088 [the question is "not whether killing the abuser was reasonable in the sense of being an understandable response to ongoing abuse"].)  Rather, "[t]he issue remains 'whether a "reasonable person" in [Brady's] situation, seeing and knowing the same facts, would be justified in believing he was in imminent danger of bodily harm.' " (*Brady*, at p. 1018.) To the extent Brady sought to fold his background into the reasonableness inquiry, he "would be setting his own standard of conduct, contrary to the law." (*Id*. at p. 1017; see *People v. Steele* (2002) 27 Cal.4th 1230, 1252 [" 'no defendant may set up his own standard of conduct and justify or excuse himself' "].)  More specifically, taking his "unique personal susceptibility to *inaccurate* perception" into account during that inquiry would effectively relax the reasonable person standard.  (*Id*. at p. 1010, italics added.)

Brady did not raise an instructional error claim.  However, we noted that the trial court in his case gave the same pinpoint instruction given in *Jefferson*:  " 'In determining how a reasonable person would act, you cannot consider as a circumstance a mental state unique to the defendant which affected his ability to perceive the situation.  You are to consider how a reasonable person in the defendant's position seeing and knowing the same facts would act.' " (*Brady*, *supra*, 22 Cal.App.5th at p. 1018, fn. 6, citing *Jefferson, supra,* 119 Cal.App.4th at p. 508.)  We noted this language was consistent with the objective reasonable person standard, as opposed to a custom standard.  (*Id*. at pp. 1017–1018 & fn. 6.)

16

3. *The pinpoint language seems unnecessary in light of the evidence in this case, but any error was harmless beyond a reasonable doubt.*

Burns argues the pinpoint language given in *Jefferson*, *Brady*, and this case "conflicted with" the standard language in the self-defense instruction directing the jury to "consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed." Burns suggests the *Jefferson/Brady* pinpoint was not warranted in this case because his self-defense claim was not based on a unique mental state, mental illness, or impairment. Rather, his history with Martinez and his experience being homeless were circumstances that could have helped the jury understand his situation at the time of the killing and determine if his belief in the need to defend himself was reasonable. This conflicting language, Burns contends, compromised his defense.

We independently review claims of instructional error. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) "The relevant inquiry here is whether, 'in the context of the instructions as a whole and the trial record, there is a reasonable likelihood that the jury was misled to defendant's prejudice.' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475.) "Also, ' " 'we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " ' " (*Ibid*.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

On some level, we agree with Burns that the pinpoint did not seem necessary in this case. In *Jefferson*, the defendant testified that he heard voices telling him the victims would hurt him. (*Jefferson, supra,* 119 Cal.App.4th at pp. 512–513.) Throughout trial, the defense repeatedly

17

argued the reasonable person standard in that case should be someone with the defendant's mental illness who heard voices. (*Id*. at pp. 516–518.) Similarly, in *Brady*, the defendant suddenly stabbed the victim as he gazed into the distance. (*Brady, supra,* 22 Cal.App.5th at p. 1011.) The defense presented evidence that he had PTSD and other personal attributes that caused him to *misperceive* threats of violence. (*Id*. at pp. 1013, 1017.) In those cases, the pinpoint clarified that—in deciding what would appear necessary "to a reasonable person in the same or similar circumstances"— the jury should not consider the defendant's mental state that *diminished* his ability to accurately perceive the situation before him as a "circumstance." (*Jefferson*, at pp. 517–518; see also *Brady*, at p. 1018 & fn. 6.) Defendants are not entitled to argue that an objectively unreasonable assault or killing should nevertheless be excused based on a mental condition or past experience. More succinctly, the reasonable person standard is never reduced to a "reasonable person with" standard. (See *Jefferson*, at p. 520; *Brady*, at p. 1010.)[2]

By contrast, in this case, there was no evidence before the jury clearly indicating that Burns experienced any mental condition involving delusion or misperception at the time of the stabbing. To be sure, Burns described his experience with chronic homelessness, as well as a time in 2014 when he was violently robbed. However, he said these experiences made him leery and distrustful, not delusional or confused. At trial, he admitted he used a

---

[2]     Burns relies on *People v. Horn* (2021) 63 Cal.App.5th 672, but we find that case inapplicable here. In *Horn*, Division Three of this court held that "a defendant's *physical infirmities* are a proper consideration for the jury in deciding the reasonableness of his claim of self-defense." (*Id*. at p. 675, italics added.) In so holding, the court expressly distinguished *Jefferson* and *Burns* as involving mental conditions. (*Id*. at pp. 684–685.) Since Burns did not claim any physical limitation, we have no occasion to address *Horn*.

variety of drugs, but claimed he was only under the influence of marijuana at the time of the stabbing. He was not asked to elaborate on whether the marijuana affected his ability to perceive the confrontation with Martinez.[3]

Contrary to the prosecution's position below, *Brady* does not prescribe the pinpoint language anytime there is evidence of the defendant's past experiences that made him or her hypervigilant. As explained above, an experience that rendered the defendant better able to accurately interpret a threat of violence may be relevant to reasonableness. (*Brady*, *supra*, 22 Cal.App.5th at pp. 1010, 1015–1017; see, e.g., *Humphrey*, *supra*, 13 Cal.4th at p. 1086 ["As violence increases over time, and threats gain credibility, a battered person might become sensitized and thus able reasonably to discern when danger is real and when it is not"].) The pinpoint would seem to be warranted in cases where the defendant is claiming a mental state that made him or her more likely to *misperceive* the situation before them, which would effectively construct their own standard of conduct.

In any event, in light of the closing arguments of counsel, we do not think the pinpoint language misled the jury to Burns's detriment. Although the trial court declined to instruct the jury that the "reasonable person standard takes into account the defendant's knowledge that may increase his or her ability to accurately predict impending violence," it expressly permitted defense counsel to argue in closing that Burns's "ability to accurately predict violence against him due to his heightened self-awareness as" a chronically homeless individual was relevant to reasonableness.

---

3    Arguably, such evidence was presented to the court at sentencing. For purposes of those proceedings, a psychologist evaluated Burns and reported that his childhood trauma and substance use disorders could have impaired his capacity for impulse control and his ability to cope with stress. The report also noted that Burns took antipsychotic medications in jail, though he did not think he experienced any hallucinations.

Defense counsel did just that. She described "the world" that Burns lived in. In his world, people were unpredictable and violent. They were often under the influence and carrying weapons. He could be robbed, chased, or attacked at any moment. He had to be on high alert at all times and take people seriously when they threatened to "smoke [his] punk ass." She argued his "knowledge of the streets, his experience on the streets," and "what his life is like every day" was relevant to reasonableness. Burns's experience with Martinez—including that Martinez had knives and a gun, previously threatened others, and recently attacked him—further showed the reasonableness of his belief in the need for self-defense. Counsel reminded the jury that "someone is justified in acting more quickly and with more force if they have been threatened before" or if "they have had physical altercations with the person before."

For his part, the prosecutor did not argue that the evidence describing the history between Burns and Martinez or the realities of homelessness was irrelevant to reasonableness. The prosecutor urged the jury to reject the self-defense claim on other grounds. Broadly, he emphasized the lack of evidence corroborating Burns's version of events. For instance, there was no evidence that Martinez had a weapon; no evidence that he lunged at Burns; and no one other than Burns heard him say, "I'll smoke your punk ass." Additionally, the prosecutor specifically argued that Burns did not actually believe he needed to defend himself. Rather, he asserted that Burns baited Martinez with the bike intending to stab him "in the public square" to show he was not weak. To that point, the prosecutor emphasized that Burns stabbed Martinez directly in the neck, as opposed to somewhere less lethal. He also highlighted that Burns immediately fled to the casino in his bloody clothes, showing a guilty mind.

20

Moreover, even assuming error, the jury's verdict convinces us that any error was harmless beyond a reasonable doubt. (See *In re Lopez* (2023) 14 Cal.5th 562, 584 [an instructional error may be held harmless beyond a reasonable doubt where "any rational jury would surely have rendered the same verdict had it been properly instructed"].) In addition to complete self-defense, the trial court instructed the jury on voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571). In relevant part, the court told the jury that Burns acted in imperfect self-defense if: (1) he "actually believed that he was in imminent danger of being killed or suffering great bodily injury or in imminent danger of being robbed;" and (2) he "actually believed that the immediate use of deadly force was necessary to defend against the danger;" but (3) "[a]t least one of those beliefs was unreasonable." By convicting Burns of murder instead of voluntary manslaughter, the jury necessarily found he acted with malice, and necessarily rejected the idea that he subjectively believed he needed to defend himself. If the jury did not accept that Burns actually held this belief, then any question on whether that belief was reasonable was inconsequential.

In sum, it is not clear the pinpoint language requested by the prosecution was warranted in this case, as Burns never claimed to experience any mental illness, delusion, hallucination, or misperception during the stabbing. But because defense counsel nevertheless made her argument clear in closing, and the prosecutor did not otherwise confuse the matter, we discern no reasonable likelihood that the jury was misled to the detriment of Burns. Moreover, we are confident that any possible error was harmless beyond a reasonable doubt given that the jury's murder verdict necessarily rejected an imperfect self-defense theory.

21

**B.** ***The trial court properly denied a defense request to release juror identifying information or summon the jurors for questioning about their deliberations.***

Burns next argues the trial court erred and violated his constitutional rights to due process and a fair jury trial by denying his postverdict motion to release juror contact information. He argues the court should have granted the motion, or at least ordered the jurors to appear in court to be questioned regarding potential misconduct. We believe the court reasonably declined to take further action based on Burns's insufficient showing of good cause.

1. *Additional background*

After the jury returned its verdict in this case, Burns filed an application for an order disclosing the jurors' names, addresses, and telephone numbers. His counsel claimed this information was necessary to prepare a motion for new trial based on jury misconduct. The application was supported by a summary of an interview between a defense investigator and a juror. According to the summary, the juror contacted the public defender several months postverdict in order to give feedback on the trial and share her opinion about the criminal justice system.

The juror explained that she had served on a handful of juries in criminal trials in San Francisco and San Diego. Based on her experiences, she felt that San Francisco jurors had more compassion and empathy for individuals experiencing homelessness than San Diego jurors. Regarding this particular case, she told the investigator, in pertinent part:

22

"[Her] fellow jurors on Johnny's trial were quick to judge Johnny by the way he looked; his tattoos and way of life did not sit well with them. Instead of looking over ALL evidence put forth at trial the Jurors mainly focused their attention on the surveillance video of the actual incident between Johnny and Jose De Jesus Martinez at Burger King. The Jurors reviewed the surveillance video in slow motion over and over. [She] essentially thought watching the surveillance video in slow motion gave them a false interpretation of what happened. The incident between Johnny and Jose De Jesus Martinez happened quickly and was over in seconds. [She] believes there should be limitations on how many times a video can be manipulated during deliberation.

"The Jurors were quick to find Johnny guilty without going over ALL evidence and discussing it. Jurors made comments about wanting the deliberation over with so they could start their weekend. They couldn't care less about locking Johnny up for the rest of his life; guilty or not guilty. The Jurors did not like the way Johnny looked and did not want him out on the street in their community.

"Verdicts are based on emotions not on evidence. Jurors in San Francisco did not want to find the Defendant guilty because they felt compassion for the struggles he had to face daily being homeless. Johnny did not get compassion or empathy; he was judged by the way he looked and was found guilty."

At a hearing on the application, defense counsel argued that the summary showed "the jurors immediately judged Mr. Burns" and "were biased against him based on how he looked, based on the fact that he was homeless" and improperly considered these factors in their deliberations. Counsel also highlighted that the jurors wanted to finish deliberating before the weekend, which could indicate pressure to reach a verdict. She asked for an opportunity "to explore this in more detail."

23

The trial court denied the application for lack of good cause. The court first noted that the jury began deliberating on a Thursday afternoon. They deliberated all day the next day, a Friday. Around 4:00 p.m. that day, the jury requested a readback of certain testimony. The readback proceeded from 4:20 p.m. until about 4:30 p.m., then the jury was released for the weekend. The jurors continued deliberating on Monday until reaching their verdict around 10:30 a.m. That, in conjunction with the statement that the jury reviewed the surveillance video, suggested to the court that the jurors were actually deliberating on their verdict as they were instructed. Otherwise, the court found the juror's statements too conclusory and vague to establish good cause.

Burns then filed a motion for new trial on grounds that included jury misconduct. Relying on the same interview summary, defense counsel argued the jurors improperly let bias, emotion, and prejudice influence their verdict, and must have improperly concealed this bias during voir dire when they were asked about tattoos and homelessness. To the extent the juror said her fellow jurors "did not want [Burns] out on the street in their community," they improperly considered punishment as well. The trial court denied the motion at the outset of the sentencing hearing. In its ruling, the court reiterated that it found the statements in the summary to be "opinions and impressions, speculative and vague and conclusionary to the extent they refer to allegations of misconduct."

2. *The trial court acted within its discretion in declining to release juror information or require the jurors to appear for questioning.*

Upon the recording of the verdict in a criminal case, the jurors' personal identifying information—their names, addresses, and telephone numbers—must be sealed until further order of the court. (Code Civ. Proc.,

24

§ 237, subd. (a)(2).) However, the defense may petition the court for access to the identifying information as necessary to communicate with the jurors "for the purpose of developing a motion for new trial or any other lawful purpose." (*Id.*, § 206, subd. (g).) "The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information." (*Id.*, subd. (b).)

In this context, "good cause" requires " 'a sufficient showing to support a reasonable belief that jury misconduct occurred.' " (*People v. Cook* (2015) 236 Cal.App.4th 341, 345 (*Cook*).) "Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported." (*Id.* at p. 346.) "Absent a showing of good cause for the release of the information, the public interest in the integrity of the jury system and the jurors' right to privacy outweighs the defendant's interest in disclosure." (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1430 (*McNally*).) To make the required showing of good cause, the petitioning defendant does not need to introduce admissible evidence establishing that juror misconduct actually occurred. (*People v. Johnson* (2013) 222 Cal.App.4th 486, 493 (*Johnson*).) Rather, the defendant must convince the court "that talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct." (*Ibid.*)

Evidence Code section 1150 limits the admissibility of evidence regarding jury deliberations. It states, in part: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes

25

by which it was determined." (*Id.*, subd. (a).) " ' "This statute distinguishes 'between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved . . . .' 'This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration." ' " (*Johnson, supra*, 222 Cal.App.4th at p. 494, internal citations omitted.) A statement made in the jury room may be admissible if the statement itself constitutes misconduct, but not where the statement merely reflects mental processes. (*Id.* at pp. 494–495.) Statements of bias or prejudice fall into the former category. (*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 788.)

We review the denial of a petition for disclosure of juror information for an abuse of discretion. (*Cook, supra*, 236 Cal.App.4th at p. 346.)

Here, the trial court reasonably denied the defense's petition for lack of good cause. The juror said her fellow jurors judged Burns by the way he looked, his tattoos, and his way of life, and "did not want him out on the street in their community," but she did not explain how she drew this conclusion. To be sure, a statement of bias may be admissible evidence of juror misconduct, but the juror referred to no such statements. As the trial court appropriately noted, the juror did not identify what any other juror said, when or where they said it, or how many jurors were involved. (See *Johnson, supra*, 222 Cal.App.4th at p. 493 [the defendant must "prove that talking to the jurors is reasonably likely to produce admissible evidence of juror misconduct"].) Without any indication that her impression was based

26

on objectively verifiable remarks or conduct by her fellow jurors—as opposed to the fact that the San Francisco jury acquitted the defendant whereas the San Diego jury convicted Burns—the defense would be left "fishing" for evidence of jury misconduct. (*McNally*, *supra*, 236 Cal.App.4th at p. 1431.) Her suggestion that her fellow jurors were quick to find Burns guilty without going over all the evidence was likewise conclusory, vague, and belied by the fact that the jury deliberated for multiple days, asked for a readback of certain testimony, and carefully reviewed the surveillance video, which was an important piece of evidence at trial. While she said other jurors "made comments about wanting the deliberation over with so they could start their weekend," the jury in fact continued deliberations the following Monday. Overall, her statements were fairly characterized as "speculative, conclusory, vague, or unsupported," which is insufficient to establish good cause.[4] (*Cook*, *supra*, 236 Cal.App.4th at p. 346.)

## C. *The trial court acted within its discretion by admitting evidence of Burns's prior convictions and misconduct.*

Burns also contends the trial court abused its discretion and denied his right to a fair trial by admitting evidence of his prior convictions and misconduct. The majority of this evidence was admitted under Evidence

---

[4] For similar reasons, we reject Burns's claim that the trial court should have ordered the jurors to appear for questioning, as well as his related constitutional challenge. (See *People v. Tuggles* (2009) 179 Cal.App.4th 339, 385–386 [a trial court may order jurors to appear at a hearing when the defendant presents "a credible prima facie showing that serious misconduct has occurred"]; *McNally*, *supra*, 236 Cal.App.4th at p. 1431 ["[a]bsent a prima facie showing [of] jury misconduct, a defendant has no fundamental right to access confidential juror identifying information after trial"]).

Code[5] section 1103, which allows evidence of a defendant's violent history to come in at trial after the defendant presents evidence of the victim's violence. Since the admitted evidence of Burns's and Martinez's violence was generally equal, we see no error or unfairness. Some additional evidence was admitted to impeach Burns. Given the relative innocuity of this evidence, we are satisfied that any error was harmless.

1.    *The trial court properly admitted the priors under section 1103.*

"The general public policy on character or propensity evidence is that it is *not* admissible to prove conduct on a given occasion." (*People v. Cottone* (2013) 57 Cal.4th 269, 285, citing § 1101, subd. (a).) Section 1103 sets forth exceptions to this rule. Under section 1103, subdivisions (a) and (b), if "a defendant offers evidence to establish that the victim was a violent person, thereby inviting the jury to infer that the victim acted violently during the events in question, then the prosecution is permitted to introduce evidence demonstrating that (1) the victim was not a violent person, and (2) the defendant was a violent person, from which the jury might infer it was the defendant who acted violently." (*People v. Fuiava* (2012) 53 Cal.4th 622, 695–696 (*Fuiava*).) Such evidence may take the form of opinion, reputation, or specific instances of conduct. (§ 1103, subds. (a) & (b).) These provisions were enacted to level the playing field between the prosecution and the defense, and to ensure " 'that juries are given a complete picture of both the defendant's and victim's character.' " (*Fuiava*, at p. 696.) Admission of character evidence is still subject to exclusion under section 352 "if admitting the evidence would have confused the issues at trial, unduly consumed time,

---

5      Undesignated statutory references in this part of the Discussion are to the Evidence Code.

or been more prejudicial than probative." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827–828 (*Gutierrez*).)

We review a trial court's decision to admit evidence under sections 1103 and 352 under a deferential abuse of discretion standard. (*Gutierrez, supra,* 45 Cal.4th at pp. 827–828.) Under this standard, a trial court's ruling " 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Id.* at p. 828.)

Here, the trial court acted well within its discretion under section 1103. When Burns presented evidence that Martinez was violent, he "opened the door" to evidence of his own violent past coming in. Consistent with the very purpose of section 1103, the admitted evidence of their respective characters for violence was relatively equal in amount and kind. The court allowed the defense to present about seven instances where Martinez was aggressive, violent, and threatening between April 2019 and January 2020. These included multiple instances where he was physically violent towards women and police officers, instances where he was the first aggressor, and one instance where he had a knife. In turn, the court admitted about five instances where Burns hit or grabbed people across 2002 to 2019. Of these five instances, only one involved a woman, and the only weapon used was a skateboard. The defense also presented evidence of Burns's peaceful nature. His wife testified that he was never violent with her or their daughter, and she had never seen him act violently toward anyone else. An acquaintance and former roommate similarly testified that she never saw Burns act violently in the 30 years that she knew him.

In comparing the evidence admitted, Burns was not painted as more violent than Martinez. If anything, the jury could have fairly found Martinez

29

to be more aggressive, since he committed more acts of violence within a shorter, recent time period, and no one otherwise described him as peaceful.

Burns fails to demonstrate that the trial court should have excluded his priors under section 352. He makes four brief points. First, he asserts the priors were "highly prejudicial," but none were as violent as the lethal stabbing of Martinez. (Cf. *People v. Ewoldt* (1994) 7 Cal.4th 380, 405 (*Ewoldt*) [the potential for prejudice is decreased when "the testimony describing defendant's uncharged acts . . . was no stronger and no more inflammatory than the testimony concerning the charged offenses"].) Second, he claims the jurors would have found it difficult to presume his innocence after hearing about the priors. Instead, they would have seen him as inclined to attack people. But when Burns elected to present evidence of Martinez's violence, his own violence became fairly admissible. (*Fuiava, supra*, 53 Cal.4th at p. 698.) The evidence of Burns's prior violence was not more extensive or egregious than Martinez's, such that the jury would have been compelled to reject his self-defense claim based on his priors alone.

Third, he notes that some of his priors did not result in criminal charges, and some involved disputed facts. Generally, evidence of a prior act that did not result in conviction may tempt the jury to punish the defendant for that prior act, or may confuse the issues since the jury must determine whether the act occurred. (*Ewoldt, supra*, 7 Cal.4th at p. 405.) Here, of the five priors admitted under section 1103, only two did not result in conviction.

The first was in 2011 when police saw Burns hit someone at a park. To be sure, before trial, the defense asked the court to exclude this incident because the initial victim did not cooperate with police. The prosecution conceded they lacked sufficient evidence regarding the initial victim, but police officers saw Burns hitting a second person who tried to intervene.

30

Accordingly, the court limited the evidence to this second alleged victim. Then, at trial, Burns simply admitted he "slapped someone" or hit "a person" at a park. Since the evidence of this incident was relatively benign, very brief, and limited to what was verifiable by police, we see no real risk that the jury became vengeful or confused by this incident.

The second incident that did not result in a criminal conviction was in 2019 when Burns grabbed a man by his hair and pulled him into a garage because he slept with Burns's then-girlfriend. The man cried and gave Burns some drugs, apparently to avoid getting beat up. This did not present any confusing evidentiary issues, as Burns admitted his conduct in a recorded call from jail, which was played for the jury at trial. And since Burns took the altercation no further—he did not injure the man—we again see no material risk that the jury would have been inclined to convict Burns of murder to punish him for this relatively mild incident.

Finally, he points out that some of the priors "were old, over 15 years old." Remote prior conduct may be "less probative of propensity than more recent misconduct" especially when "the defendant has led a substantially blameless life in the interim." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 534.) But Burns did not commit a single act of violence many years ago. Rather, the evidence admitted under section 1103 showed that he slapped, punched, hit, or grabbed people in 2002, 2007, 2010, 2011, and 2019. And between those incidents, he was incarcerated for some time. (Cf. *People v. Lewis* (2009) 46 Cal.4th 1255, 1287 [probative value maintained where "defendant had been incarcerated for much of the intervening time"].) Given this steady history of violence, the court was justified in admitting these priors despite their age.

In sum, we find nothing arbitrary, capricious, or patently absurd about the trial court's decision to admit evidence of Burns's violent past after he elected to present evidence demonstrating that Martinez was violent.

2.    *Evidence admitted under a theory of impeachment was harmless.*

Most of the evidence of Burns's priors was admitted under section 1103. In addition to the 2011 incident where Burns hit someone at a park and the 2019 incident where he pulled someone by their hair, the conduct underlying his three felony convictions was admitted pursuant to section 1103. In 2002, he got into a physical fight with a female friend at a motel. In 2007, he hit a man in the face with his own skateboard because he owed Burns $70. And in 2010, he was placed in the "drunk tank" at a police station. He hit another man in the drunk tank, then ordered the man to clean up his own blood and tell the officers he had a seizure or else Burns would serve his "motherfucking ass."

A bit more evidence was admitted solely on an impeachment theory, including the fact that the above conduct resulted in three convictions—attempted battery causing great bodily injury, assault with a deadly weapon, and attempting to dissuade a witness. The conduct underlying three additional incidents was admitted for impeachment as well. In 2015, an ex-girlfriend became angry with Burns. She called the police, saying he stole her backpack, threatened her, and held a knife or box cutter to her throat. In 2018, he pled guilty to misdemeanor commercial burglary after he was caught living in an abandoned building with other homeless people. Finally, at the end of 2019, he stole a coloring book from a large bookstore to give to his young daughter for Christmas.

Even assuming the trial court abused its discretion here, there is no reasonable probability of a different result had the jury not learned these

32

additional details. (See *People v. Partida* (2005) 37 Cal.4th 428, 439 ["Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson*[6] test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error"].) As discussed, the violent facts underlying the three felony convictions were properly before the jury under section 1103. The further detail that each incident resulted in a guilty plea could not have reasonably tipped the jury's scale toward disbelieving Burns. The evidence of the 2015 incident involving the ex-girlfriend was rather weak, since she later admitted she was "very high" when she called the police on Burns and made up her allegations against him. Lastly, the evidence that Burns once lived in an abandoned building and once tried to steal a coloring book is so benign in the context of this case, there is no real chance this evidence significantly affected the jury's deliberations.

**D.** ***Any misconduct by the prosecutor in cross-examining Burns regarding the prior conviction for attempting to dissuade a witness was harmless.***

Burns next contends the prosecutor committed misconduct by asking him argumentative questions during cross-examination, in violation of his constitutional rights to due process and a fair trial. We conclude that any misconduct was harmless under any standard.

1. *Additional background*

As mentioned above, Burns sustained a conviction for attempting to dissuade a witness following an altercation in the "drunk tank" at the police station. On direct examination, Burns admitted the conviction, but said he could not remember anything about the incident because he was "really

---

[6] See *People v. Watson* (1956) 46 Cal.2d 818, 836.

33

drunk" at the time. To impeach Burns and demonstrate his character for violence, the prosecutor played a video-and-audio recording of the altercation on cross-examination. The recording was about 15 or 20 minutes long.

The prosecutor's general strategy was to play several seconds of the video, then pause it and ask Burns to confirm what was said or done in that particular clip. Burns did not refute what the video showed, but maintained that he did not independently recall the incident. To illustrate the nature of the exchange, the prosecutor paused the video at 37 seconds and asked:

> "[Prosecutor]: Nothing about this rings a bell to you at all?
>
> "[Burns]: Um, again, I mean. I'm—the answer is the same. I don't remember this incident. I was drunk. That's the reason we are in the drunk tank." [¶] . . . [¶]
>
> "[Prosecutor]: You actually told [the victim] to shut the fuck up with that laughing, homie. You better watch your motherfucking mouth, right?
>
> "[Burns]: "Again, I don't remember this. So I can't— I mean, that's what you just showed me. So I believe so, yes."

Similarly, at 5 minutes, 22 seconds, the prosecutor paused and asked:

> "[Prosecutor]: You told him what would happen if he got into your personal space, right?
>
> "[Burns]: That's what the video shows, yes.
>
> "[Prosecutor]: You told him that if he—that he better give you your space or he's going to get his shit split, right?
>
> "[Burns]: Again, that's what it shows, yes.
>
> "[Prosecutor]: You are still saying you don't remember any of this?
>
> "[Burns]: Um, yes. I don't remember.

"[Prosecutor]: You told him that you needed him to wipe up his own blood because, if the cops found out, you would, quote, serve his motherfucking ass, right?" [¶] . . . [¶]

"[Burns]: The questions—no matter what you ask me, my answer is that [I] don't remember. I don't remember any of this. I can't change that for you. I don't remember this entire incident. Just repeating myself again and again. I don't remember."

This continued until the end of the video. Burns argues the prosecutor's questions were argumentative because they were not intended to elicit any facts, as he repeatedly told the prosecutor he did not recall the incident. Rather, the questions were intended to belittle him, minimize his credibility, and provoke him to lose his temper.

2. *The issue is sufficiently preserved for appeal.*

As an initial matter, the Attorney General claims that Burns forfeited this issue because defense counsel did not specifically allege prosecutorial misconduct or request a curative admonition in the trial court.

" 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).) However, a "defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile." (*Ibid.*) In addition, "the absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' " (*Ibid.*)

35

As Burns noted in his opening brief, defense counsel lodged multiple objections while the prosecutor questioned him regarding the drunk tank incident. When the prosecutor began asking Burns repetitive questions about whether he remembered what the video showed, defense counsel objected: "Asked and answered and the video speaks for itself." The trial court overruled the objection. When the prosecutor persisted, defense counsel again objected on grounds of "asked and answered" and "argumentative." The court overruled these objections as well. Counsel objected about seven more times during this portion of cross-examination, on grounds including that the questions were asked and answered, argumentative, and cumulative, and the prosecutor was testifying. We think these repeated and varied objections sufficed to alert the court that the defense took issue with the prosecutor's general approach to cross-examination regarding this incident. Since many of these objections, especially at the beginning of questioning, were promptly overruled, we decline to reject the claim based on forfeiture.

3.  *Any prosecutorial misconduct was harmless.*

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established.' " (*Hill*, *supra*, 17 Cal.4th at p. 819.) A prosecutor violates the federal constitution when their intemperate behavior establishes " 'a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*Ibid*.) Misconduct that does not render a trial fundamentally unfair violates state law "only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*Ibid*., internal quotations omitted.)

Burns makes a strong argument that the prosecutor's repetitive questioning regarding the drunk tank incident became argumentative. "An argumentative question is a speech to the jury masquerading as a question. The questioner is not seeking to elicit relevant testimony. Often it is apparent that the questioner does not even expect an answer. The question may, indeed, be unanswerable." (*People v. Chatman* (2006) 38 Cal.4th 344, 384.) "An argumentative question that essentially talks past the witness, and makes an argument to the jury, is improper because it does not seek to elicit relevant, competent testimony, or often any testimony at all." (*Ibid.*) Instead, it may be aimed at agitating or belittling the witness (*People v. Lund* (2021) 64 Cal.App.5th 1119, 1148), or designed to engage the witness in an argument (*People v. Johnson* (2003) 109 Cal.App.4th 1230, 1236).

Even assuming misconduct by the prosecutor and error by the trial court in failing limit the questioning, we must still determine if the error was prejudicial. "Prosecutorial misconduct can result in reversal under state law if there was a 'reasonable likelihood of a more favorable verdict in the absence of the challenged conduct' and under federal law if the misconduct was not 'harmless beyond a reasonable doubt.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 334.) Burns contends the prosecutorial misconduct in this case was prejudicial under either standard. We are not convinced.

We do not think this questioning turned the jury against Burns in the manner he suggests. It was reasonable for Burns to claim he was so intoxicated that he could not recall this particular altercation. The incident took place 12 or 13 years prior, in the "drunk tank" of a police station. Moreover, as the prosecutor seemed to recognize, Burns was noticeably drunk in the video. He wobbled, slurred his speech, repeated himself, and paced the holding cell. Of course, we did not observe Burns on the stand at trial.

37

However, the cold record suggests that he maintained his composure despite the persistent questioning. He did not say anything inappropriate, defense counsel did not request a break for his sake, and the trial court did not admonish him.

Even assuming the prosecutor caused the jury to question Burns's veracity regarding this particular incident, we are not persuaded this cast doubt on his credibility in general. This area of questioning concerned just one prior incident among several discussed at trial. It was unrelated to the stabbing at issue. Otherwise, Burns was generally forthright about his faults. Again, he did not deny his regrettable statements and conduct shown on the video. He simply lacked an independent memory of the altercation. Moreover, he readily admitted he was guilty of many other prior offenses, he conceded his violence against his female friend in the motel was wholly unjustified, he was transparent about his drug use, and he admitted he screamed in the parking lot to confront whomever was trying to take his bike.

Since Burns very reasonably could not remember the details of just one prior incident unrelated to the offense at issue, we conclude the prosecutor's method of questioning, even if misconduct, was "harmless under any standard of prejudice." (*People v. Smith* (2015) 61 Cal.4th 18, 52.)

### E.     *Burns does not fall outside the spirit of the Three Strikes law.*

At sentencing, Burns invited the trial court to dismiss his prior strike under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*). The court declined the invitation. Burns now asserts the court erred.

We review the denial of a *Romero* motion for abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*).) Abuse is found where the decision is "so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.) This occurs, for example, where the trial

38

court was not aware of its discretion to strike a prior conviction or considered improper factors. (*Id.* at p. 378.) In determining whether to strike a prior strike allegation "in furtherance of justice" (§ 1385, subd. (a)), a court must " 'consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, the particulars of his background, character, and prospects, the defendant may be deemed outside the [Three Strikes] scheme's spirit, in whole or in part, and hence be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' " (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

We cannot say this is an "extraordinary case" where the evidence "manifestly support[s] the striking of a prior conviction and no reasonable minds could differ." (*Carmony*, *supra*, 33 Cal.4th at p. 378.) In denying the *Romero* motion, the trial court considered relevant factors, including Burns's background, his criminal history, and the nature of the current offense. The court failed to see how Burns fell outside the spirit of the Three Strikes law given his "multiple misdemeanor convictions, multiple probation revocations, multiple prison commitments for felony convictions that involved violent acts, multiple parole violations and revocations." Indeed, as set forth in the probation report, Burns sustained about 5 felony and 15 misdemeanor convictions over the years, including assault, robbery, and attempted battery convictions. (Cf. *People v. Mantanez* (2002) 98 Cal.App.4th 354, 366 [10 felony convictions resulting in four separate prison terms and multiple parole violations over 17-year period brought defendant "squarely within the Three Strikes ambit"].) This culminated in the lethal stabbing of Martinez that— given the jury's rejection Burns's self-defense claim—the court justifiably characterized as a senseless and greatly violent attack. On this record, we see no abuse of discretion.

**F.** *The trial court rationally declined to dismiss the prior serious felony enhancement.*

Burns contends the trial court also erred at sentencing by denying his motion to dismiss the five-year prior serious felony enhancement under amended section 1385. Again, we see no abuse of discretion.

Effective January 1, 2022, Senate Bill No. 81 amended section 1385 to add subdivision (c). (Stats. 2021, ch. 721, § 1.) Section 1385, subdivision (c)(1) now provides that "the court shall dismiss an enhancement if it is in the furtherance of justice to do so," and subdivision (c)(2) states that "[i]n exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence" of nine listed "mitigating circumstances," any one of which "weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety." Subdivision (c)(2) of section 1385 clarifies that " '[e]ndanger public safety' " in this context "means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." If the sentencing court finds that dismissing an enhancement "would endanger public safety," it need not consider the listed mitigating circumstances. (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 296 (*Mendoza*).)

Burns briefly notes that several of the listed mitigating circumstances existed in his case: (1) multiple enhancements were alleged in a single case; (2) the enhancement was based on a prior conviction that was over five years old; (3) applying the enhancement could result in a sentence exceeding 20 years; (4) the current offense "could be considered" connected to mental illness; and (5) the current offense "could be considered" connected to childhood trauma. (See § 1385, subd. (c)(2)(B)–(E) & (H).) Regarding the latter two factors, the defense filed a sentencing brief in the trial court that

40

detailed Burns's undeniably tragic childhood, marked by multiple forms of abuse, abandonment, homelessness, and incarceration. Along with that brief, the defense submitted a report prepared by a psychologist who evaluated Burns. The psychologist determined that he struggled with substance use disorders, a complex trauma disorder, as well as symptoms of anxiety and depression. The psychologist further opined that his childhood trauma and untreated substance abuse would have impaired his capacity for impulse control and his ability to cope with stress, and thus "indirectly" contributed to or "played a role" in the current offense.

The trial court expressly considered the mitigating information presented by the defense. Nevertheless, it declined to dismiss the prior serious felony enhancement, finding Burns was "a danger to public safety, given his repeated and violent conduct against others and the circumstances in this case." We cannot say the court abused its discretion on this point, as the record confirms that Burns has repeatedly used physical violence in a variety of contexts—against women and men; against acquaintances and strangers; in private and public spaces; based on petty disagreements, money, and romantic rivalries. (See *Mendoza*, *supra*, 88 Cal.App.5th at p. 298 [abuse of discretion is the proper standard of review for the trial court's decision that dismissing an enhancement would endanger public safety].) Despite multiple convictions and prison terms for his aggressive conduct, Burns escalated the violence, fatally stabbing Martinez in the neck outside a public eatery in this case.

Burns argues this decision was erroneous because "[t]here was no showing how release of a 70 year old man would endanger public safety."[7]

_____

[7] Burns was 50 years old at the time of sentencing. He received 965 days of presentence custody credit.

41

While age may be one factor in the dangerousness analysis—indeed, defense counsel highlighted Burns's age in requesting the minimum sentence—it is not the *only* factor.  Section 1385 "does not require the trial court to consider any particular factors in determining whether 'there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.' " (*Mendoza*, at p. 299.)  Burns does not argue that his prior offenses and the nature of the current offense were irrelevant to the dangerousness inquiry.  (Cf. *ibid.* [trial court considered term length, nature of the crime, and age of defendant].)  Since these factors showed that his violence actually *increased* with age, we cannot say the court's decision was "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at p. 377.)

## G.     People v. Dueñas *does not compel us to reverse or remand.*

Finally, relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Burns maintains the trial court violated his right to due process by imposing a $10,000 restitution fine (§ 1202.4, subd. (b)), a $40 court security fee (§ 1465.8, subd. (a)(1)), and a $30 criminal conviction fee (Gov. Code, § 70373) without determining his ability to pay.[8]  We disagree.

When the trial court initially imposed these amounts at the sentencing hearing, defense counsel asked the court to stay the fines and fees based on inability to pay.  The court denied the request "in light of the prison term being imposed"—35 years to life—and the wages that Burns could earn in prison.  The court noted it had no information suggesting he would be unable to earn prison wages.  In the event he became unable, the court advised he could pursue administrative remedies or return to court.    At the end of the

---

[8]    The court also imposed a $10,000 parole revocation fine (§ 1202.45) that will be stayed unless and until parole supervision is revoked.

hearing, Burns told his counsel that he would be unable to work in prison due to health conditions. Counsel asked for permission to add the matter back on calendar "if there is an issue regarding his work status in the prison." The court granted counsel leave to present more information at a future date. However, there is no indication in the record that the parties returned to court.

In *Dueñas*, *supra*, 30 Cal.App.5th 1157, Division Seven of the Second Appellate District held that as a matter of due process, a trial court is required to conduct an ability to pay hearing before imposing assessments for court facilities and court operations. (*Id*. at p. 1164.) While section 1202.4 requires courts to impose a $300 restitution fine without considering a defendant's ability to pay, *Dueñas* reasoned that this fine could be imposed *but stayed* pending a determination on defendant's ability to pay. (*Dueñas*, at p. 1172.) A panel of this court later accepted the due process framework in *Dueñas* as to nonpunitive fees and assessments, but concluded that punitive fines and fees should instead be assessed under the excessive fines clause of the Eighth Amendment, which in turn considers a defendant's ability to pay as one of several factors. (*People v. Kopp* (2019) 38 Cal.App.5th 47, 95–98, review granted Nov. 13, 2019, S257844 (*Kopp*).) Division Four of the First Appellate District similarly applied an Eighth Amendment analysis to evaluate a range of fines and fees. (*People v. Cowan* (2020) 47 Cal.App.5th 32, 50, review granted June 17, 2020, S261952 (*Cowan*).)

Review remains pending in *Kopp* as to whether a trial court must constitutionally consider a defendant's ability to pay before imposing or executing fines, fees, and assessments, and if so, which party bears the burden to prove the defendant's inability to pay. The Supreme Court has also granted review in related cases, including *Cowan*, which expanded on *Kopp*'s

Eighth Amendment analysis, and *Hicks*, which rejected *Dueñas*'s due process analysis outright. (*People v. Hicks* (2019) 40 Cal.App.5th 320, 326, review granted Nov. 26, 2019, S258946; accord *People v. Cota* (2020) 45 Cal.App.5th 786, 795.) We will follow *Kopp* until the Supreme Court says otherwise.

The $10,000 fine the court assessed under section 1202.4, subdivision (b) is punitive in nature. (See *Kopp*, *supra*, 38 Cal.App.5th at p. 96.) As such, the propriety of that fine is best analyzed under the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. (*Kopp*, at p. 97.) Although the Attorney General asserted in his brief that the fine was not excessive under the Eighth Amendment, Burns specifically declined to argue otherwise. We therefore deem any Eighth Amendment challenge to the restitution fine waived.

Regarding the nonpunitive $40 court security fee and $30 criminal conviction fee, Burns was entitled to an ability to pay hearing, if requested. (See *Kopp*, *supra*, 38 Cal.App.5th at p. 95.) Despite his counsel's objection, the trial court declined to stay the fines and fees pending an ability to pay hearing. To the extent the court erred by imposing the nonpunitive fees without a proper hearing, Burns was not prejudiced. Given his lengthy prison sentence, he has ample time to earn wages in prison and pay these fees. (Cf. *People v. Johnson* (2019) 35 Cal.App.5th 134, 139–140 [imposing $370 in fines and fees without an ability to pay hearing was harmless beyond a reasonable doubt where defendant could earn wages over an eight-year term].) Burns requests a remand so he can present facts in the trial court establishing his inability to work. However, the trial court expressly gave him that opportunity and he did not return to court. He does not explain why this opportunity was insufficient. Accordingly, we are not persuaded that a remand is warranted here.

44

## DISPOSITION

The judgment is affirmed.

DATO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

KELETY, J.